[No. B198111. Second Dist., Div. Seven. July 1, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY STALLWORTH, Defendant and Appellant.

1080

COUNSEL

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Scott A. Taryle and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ZELON, J.**—Timothy Stallworth was convicted of first degree murder (Pen. Code,[1] § 187, subd. (a)), three counts of attempted murder (§§ 187, subd. (a), 664), three counts of shooting at an inhabited dwelling or vehicle (§ 246), assault with a deadly weapon (§ 245, subd. (a)(1)), and misdemeanor battery (§ 242). On appeal, Stallworth contends that his convictions should be reversed because (1) his extrajudicial statements should have been suppressed; (2) the redaction of his statements pursuant to *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*) distorted his testimony and violated due process and Evidence Code section 356; and (3) defective jury instructions were given. Stallworth also contends that there was insufficient evidence to support the jury's findings on the section 186.22 enhancement with respect to counts 1 through 7, and identifies two sentencing errors. We reverse the convictions on counts 1 through 7 but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Two incidents, on October 10 and 11, 2003, gave rise to the instant prosecution.

I. *October 10, 2003: Freeway Shootings*

Assailants in a white Tahoe[2] with special rims opened fire on three cars that left a Cerritos skating rink parking lot on the night of October 10, 2003. Latisha Stephens was shot in the head as she drove her Ford Explorer. The

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

[2] The vehicle was also described as a Yukon in some instances, but we will refer to it as a Tahoe for consistency and clarity.

gunshot caused significant brain damage, requiring Stephens to be fed through a feeding tube. That feeding tube ultimately caused an infection that resulted in Stephens's death.

Kenith Murphy's blue Tahoe was fired upon and the rear window shattered, but he was not injured. Murphy testified that during the incident, the Tahoe first drove up on his passenger side, so that the driver's side of the Tahoe was facing him. The windows on the Tahoe's driver's side went about a quarter of the way down and guns came out of the driver's side and rear driver's side window. The shooters began firing at Murphy's truck.

Murphy ducked as the shooters fired at him, and then heard the Tahoe accelerate away. Murphy saw the Tahoe pull up along the driver's side of Curtis Galbert's truck; shots were fired from the passenger side of the Tahoe. Then, the Tahoe slowed, and pulled up on Murphy's driver's side. Additional shots were fired at Murphy from the passenger side of the Tahoe. At trial, Murphy said he was not sure which part of the passenger side of the Tahoe the shots were coming from at this point. Counsel attempted to refresh his memory with testimony from an earlier hearing in which Murphy testified that the shots at this time came from the rear passenger seat. Murphy said that his prior testimony refreshed his memory a little bit, but that it was still hazy; he acknowledged that he would have given a truthful answer. When asked if it was certain that he never saw shots from the front passenger side, he testified, "No, I don't remember. Don't recall, sir."

Murphy could see the rear passenger's face down to the eyebrow area, but that person was wearing a "scully" or wave cap. He was unable to identify the individual's gender or race. At trial, he said he could not see inside the dark windows of the Tahoe. He claimed at trial that as far as he remembered there were two people firing from the Tahoe but he could not see inside.

Galbert described hearing gunshots and looking in his rearview mirror to see a white Tahoe firing at him. It appeared to be the same car he had seen at the skating rink. The Tahoe pulled up on his driver's side. Gunfire came from the Tahoe. Galbert's Avalanche was hit by 13 bullets, but he, too, was uninjured.

Galbert drove to a police station and made a report. Los Angeles Police Officer Jason Jacobson spoke with Galbert when Galbert came into the station to file the report. Jacobson inspected Galbert's vehicle and spoke with Galbert about the assailants and their vehicle. Jacobson testified that Galbert "indicated the vehicle was a 2001 or possibly 2002 Chevy Tahoe[,] white in color. Suspects—there was a total of four occupants. He described the driver as a male Black in his mid to early 20's with braided hair

and the rear passenger on the passenger side wearing—it was also mid 20's male Black with bald or shaven head wearing a red shirt. The front passenger and the passenger in the rear driver's side he couldn't give me a description beyond male Black." Galbert told Jacobson that there was one shooter: the male Black in the rear passenger seat wearing the red shirt.

Early in the morning on October 11, 2003, Galbert spoke with Long Beach Police Officer Ryan Riordan. By stipulation, the jury was told that Riordan would have testified as follows: "that he interviewed Curtis Galbert on October 11th, 2003, between the hours of 4:00 and 5:00 a.m. at the home of Curtis Galbert, that Curtis Galbert described a white Chevrolet Tahoe, newer model, possibly 2001 through 2002, four-door with dark tinted windows and large, possibly 20- to 23-inch, chrome custom wheels driving around the parking lot of Skate Depot sometime after 11:30 p.m. on October 10th, 2003; that Mr. Galbert told Officer Riordan that the occupants appeared to be talking to random groups of people in the parking lot, that Mr. Galbert described the driver as a light-skinned male Black, possibly in his mid-20's, with shoulder-length black hair in braids wearing a red t-shirt. The passenger in the front seat was described only as a light-skinned male Black; that there were possibly two passengers in the rear of the vehicle, but Galbert could only describe one as a light-skinned male Black with a bald head and a red t-shirt. Mr. Galbert stated that he could possibly identify the driver but not the passengers."

In another account given to the police on October 13, Galbert said there were only three occupants in the Tahoe and two of them were shooting. He told police that he had been able to get a good look at the occupants of the Tahoe and that "the driver was a light-skinned male Black with braids wearing a red shirt. The front passenger was a darker-skinned male Black wearing a red shirt. And the rear passenger behind the passenger seat was a light-skinned male Black with a bald head." He told the police that the front passenger and rear passenger shot at his truck. Galbert identified a photograph of Myron Davis's Tahoe as the one from which shots were fired on the freeway. He identified Davis, Stallworth, and Ramon Trotter[3] from photographic lineups, and specified that Trotter was the driver of the SUV, Davis was the front passenger, and Stallworth was a "rear passenger." Galbert told the police that he was sure of his identifications.

Although Galbert had originally cooperated with the police, he later became unwilling to cooperate, to the point where he was placed in custody for 59 days to ensure that he would testify. At trial, Galbert claimed that he

---

[3] Davis and Trotter were also charged. Trotter was tried separately and convicted in June 2005. Davis was jointly tried with Stallworth, but the jury deadlocked on counts 1 through 7, and the jury's verdict on the remaining counts are not contained in this record on appeal.

could not see who was shooting at him or what position the shooters were in within the vehicle. He claimed that he did not remember telling the police that the front and rear passengers shot at him. He said he did not remember whether he had previously seen the driver, the front seat passenger, or the rear passenger of the Tahoe at the skating rink, or whether he had told the police that he had seen them there. He denied giving or remembering giving a description of the Tahoe's occupants to police. He claimed not to see anyone in the courtroom who was shooting at him on the freeway. He claimed a similar lack of memory as to photographic identifications and asserted that it was possible that the police may have influenced, assisted him in, or pressured him into any identifications he might have given. Galbert testified that he had friends in a local gang, and that he would be perceived as a snitch if he testified about what happened or identified participants, and that negative consequences would ensue, such as being beaten up, stabbed, shot, or having a family member or home shot at.

Gunshot residue tests were performed on the Tahoe. One particle of gunshot residue and consistent particles were found on a sample from the rear passenger seat door. No gunshot residue was found on the passenger door or area next to the passenger door seat. Analysis of recovered evidence indicated that at least two firearms were used in the shooting.

## II. *October 11, 2003: Wedding Reception Fight*

On October 11, 2003, after Christopher Paiz's wedding, Paiz left the reception location and saw a fight going on outside. Two members of his wedding party were fighting; one, Manny Tilo, was injured and fell against a white SUV, leaving blood on the vehicle. The driver left the car, gave Tilo a cloth, and told him to clean the blood off the SUV. Tilo, dazed, did not immediately comply. Three more men got out of the SUV and begin to beat Tilo up. Each man hit Tilo, then one went through his pockets; another urged that they would "get caught up that way," and they all left in the SUV. During the beating, the men called, "Piru," "Blood," "Fuck you Mexicans," and other similar comments. Other fights broke out on the scene.

Sheriff's deputies responding to the incident stopped a white SUV that had left the scene. In it were Trotter (the driver), Brandon Sherouse,[4] "Dante" Stallworth (an admittedly false name), and Davis.

---

[4] Sherouse was charged in counts 8 through 10 but was no longer a defendant by the time of trial. Although it is not in the record on appeal, Stallworth informs us that Sherouse's charges were settled by plea prior to trial.

Paiz and his brother identified the Tahoe in which Stallworth and the others were apprehended as the Tahoe from the wedding reception. After Paiz and his brother identified the SUV, the officers brought people out of the vehicle and asked the men if they could identify them. Neither man did. Paiz testified at trial that he was "pretty scared" at that time, and his brother testified that he did not identify the driver that night because he was "scared for [his] life." Both brothers later identified the driver of the white SUV as Trotter.

With respect to the freeway shooting, Stallworth was convicted of the first degree murder of Latisha Stephens (§ 187, subd. (a)); the willful, deliberate, and premeditated attempted murders of Curtis Galbert, Kenith Murphy, and Leonora Anaya (the passenger in Stephens's car) (§§ 664, 187, subd. (a)); and three counts of shooting at an occupied motor vehicle (§ 246). The murder was determined by the jury to have been intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally, at another person or persons outside the vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)). For all offenses, the jury found that Stallworth employed a firearm within the meaning of section 12022.53, subdivisions (b), (c) and (e)(1); on the murder count and one count of shooting at an occupied vehicle, his use of a firearm was also determined to have proximately caused Latisha Stephens's death within the meaning of section 12022.53, subdivisions (d) and (e)(1). Finally, the jury found that all offenses in the course of the freeway shooting were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1).)

In connection with the wedding reception beating, Stallworth was convicted of assault by means likely to produce great bodily injury (§ 245, subd. (a)(1)) and misdemeanor simple battery (§ 242). The assault was determined to have been committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1).)

Stallworth was sentenced to life in prison without the possibility of parole plus 140 years to life in prison, plus an additional 13 years in prison. He appeals.

## DISCUSSION

### I. *Suppression of Statements to Police*

Stallworth unsuccessfully moved to suppress two statements he made to the police. On appeal, he claims that the statements should have been

suppressed because he did not knowingly, voluntarily, and intelligently waive his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments. (*Miranda v. Arizona* (1966) 384 U.S. 436· [16 L.Ed.2d 694, 86 S.Ct. 1602].) On review, "we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502 [54 Cal.Rptr.3d 245, 150 P.3d 1224] (*Smith*).)

## A.   *October 15 and 16, 2003 Statements*

Stallworth was first interrogated on October 15, 2003, at approximately 5:00 in the afternoon, by Long Beach Police Detectives Mark McGuire and C. Cardoza. At an evidentiary hearing prior to trial, McGuire testified that prior to interviewing Stallworth, he read Stallworth his rights from a form. Stallworth signed the form to indicate that he wished to speak with the police and that his statements were "free and voluntary with no promise of leniency or reward." Stallworth then gave a statement to the police. Stallworth did not attempt to suppress this statement.

After speaking with the police, Stallworth was booked and remained in custody until the following morning, October 16. Between 9:00 and 9:30 in the morning, Stallworth was reinterviewed in the same interview room by McGuire and Sergeant Frederick Reynolds. This interview was tape-recorded, but prior to the commencement of the taping, the police asked Stallworth if he was still aware of his rights and if he wanted to speak with them. According to McGuire, Stallworth answered both questions affirmatively. On the tape recording of this interview, Reynolds asked Stallworth if McGuire read him his rights the day before, and Stallworth said yes. Reynolds asked if Stallworth understood those rights. The transcript does not indicate that Stallworth answered the question, but McGuire testified that Stallworth answered it affirmatively. According to the transcript, Reynolds next asked Stallworth, "They are still in effect, right?" to which Stallworth responded, "Yes sir." Reynolds continued, "All right, you want to talk to me about what happened at the Carson community center?" and Stallworth answered, "Sure, whatever questions you ask me, I can tell you, you know what I'm saying, what I saw or what I know." Reynolds clarified: "So that means you want to talk to me about what happened?" Stallworth said, "I am saying yeah, you know what I'm saying."

The trial court concluded with respect to the October 16 statement, "based on the totality of the circumstance[s] that readvisement was not necessary and therefore . . . that defendant knew what those rights were and he knowingly waived them."

Stallworth disregards McGuire's testimony that he answered that he did understand his rights. He argues that his failure to respond to the question "indicates he did not understand his rights or did not remember them or did not comprehend what 'they're still in effect' meant." He asserts that his state of mind was vague and ambiguous, so he should not be deemed to have waived his rights. He also argues that he was only 18 years old with an 11th grade education, and that his two previous experiences with the legal system as a juvenile offender do not demonstrate that he was familiar with the *Miranda* warning process or the rights involved. He contends that the police should have taken the time to make sure that he did remember the warnings given to him the previous day, that he understood these warnings, and wanted to talk to the police on October 16.

■ The California Supreme Court has held that readvisement of rights "is not necessary before a custodial interrogation is resumed, so long as a proper warning has been given, and 'the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver.' " (*Smith, supra,* 40 Cal.4th at p. 504.) That court has "established several factors to determine whether readvisement is necessary prior to a subsequent interrogation held after an earlier valid *Miranda* waiver: 1) the amount of time that has passed since the initial waiver; 2) any change in the identity of the interrogator or location of the interrogation; 3) an official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) further indicia that the defendant subjectively understands and waives his rights." (*Ibid.*)

Here, the challenged interrogation occurred approximately 16 hours after the first interrogation, and Stallworth remained in custody during that interval. The interrogation was conducted in the same location as the first interrogation, and was conducted by one of the same officers who had conducted the first interview. Stallworth was reminded of the earlier *Miranda* warning and acknowledged that his rights had been read to him the previous day. There is no indication that the officers should have suspected that he was mentally impaired or otherwise incapable of remembering the prior advisement. He had some prior experience with law enforcement, but whether his juvenile proceedings gave him experience with *Miranda* warnings is not established by the record. While there is some question as to whether Stallworth stated that he understood his rights, as the recording and transcript did not pick up the affirmative answer that McGuire contended Stallworth gave, at a minimum Stallworth was given an official reminder of the prior advisement and agreed to speak with the police again. On balance of these factors, we conclude, as did the trial court, that the police were not obligated to re-advise Stallworth of his rights before interrogating him on October 16.

Moreover, under the totality of the circumstances, we conclude that Stallworth waived his *Miranda* rights knowingly and voluntarily at the October 16, 2003 interrogation. There is no indication that Stallworth was subjected to any improper pressure, trickery, or coercion at this interview, and, when reminded of the earlier warnings, he acknowledged that he had been advised of his rights and indicated that he wanted to speak with the police.

B. *December 9, 2003 Statement*

Reynolds and McGuire questioned Stallworth again on December 9, 2003. Stallworth was advised of his constitutional rights via an advisement of rights form. He initialed the form next to the provision, "I understand each of these rights explained to me" and signed under the statement, "I wish to discuss the matter with detectives Mark McGuire and Fred Reynolds." The tape of the interview discloses that McGuire began by asking, "You remember your rights? You can read, right?" Stallworth answered, "Yes sir." McGuire asked Stallworth to read the advisement sheet out loud, and Stallworth did so. Stallworth made a slight error in reading, and McGuire corrected him: "OK, [No.] 3 actually says[, ']I have the right to talk to a lawyer and have him present with me while I am being questioned.['] OK[,] do you understand?" Stallworth again responded affirmatively. McGuire continued, "Can you initial that for me please? And then sign your name right there indicating you want to talk to us about why you're here again." Questions about the offenses followed.

Despite the full advisory of *Miranda* rights and Stallworth's memorialized waiver, he contends that he did not knowingly and voluntarily waive his constitutional rights. He characterizes the police question about whether Stallworth understood as pertaining only to the specific sentence that the officer corrected. Therefore, he contends, the problem with the December 9 advisements was that Stallworth was not asked whether he understood his right to remain silent, only whether he understood that he had the right to have counsel present while being questioned. Furthermore, Stallworth contends, he was not asked if he waived those rights—even though he signed and initialed a form indicating that he did so.

The trial court characterized the police officer as "somewhat sloppy," and acknowledged defense counsel's argument that the detective employed techniques to get Stallworth to sign the document and to waive his rights, commenting, "[M]aybe it was a trick. Don't know." However, on the totality of the circumstances, the trial court concluded that Stallworth knowingly waived his rights and agreed to speak with the police.

We reach the same conclusion as the trial court. Stallworth was explicitly advised of his *Miranda* rights. When he read them aloud, the officers corrected the sole error he made; he then stated that he understood, and initialed and signed a form stating that he wanted to talk with the police. Stallworth never requested counsel or stated that he wanted to end the questioning. While the police hurried through the process of signing the form and could reasonably be called "somewhat sloppy," as the trial court did, neither the trial court found nor do we find that the police engaged in deception or coercion. On the totality of the circumstances, we conclude that Stallworth's waiver of his *Miranda* rights was knowing, voluntary, and intelligent.

## II.  *Redaction of Stallworth's Statements*

Stallworth's statements were redacted to omit mention of Davis, the codefendant with whom he was tried, pursuant to *Aranda, supra,* 63 Cal.2d 518,[5] and *Bruton, supra,* 391 U.S. 123. *Aranda* provides, "When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible." (*Aranda,* at pp. 530–531, fn. omitted.) As the Supreme Court has recently noted, "[s]everance may be necessary when a defendant's confession cannot be redacted to protect a codefendant's rights without prejudicing the defendant. [Citation.] A defendant is prejudiced in this context when the editing of his statement distorts his role or makes an exculpatory statement inculpatory." (*People v. Lewis* (2008) 43 Cal.4th 415, 457 [75 Cal.Rptr.3d 588, 181 P.3d 947].) Here, although Stallworth opposed redactions entirely and his codefendant urged separate juries, the trial court opted to redact all references to Davis and to proceed with a joint trial and a single jury. Stallworth contends that the trial court may have effectively

---

[5] In *People v. Fletcher* (1996) 13 Cal.4th 451, 465 [53 Cal.Rptr.2d 572, 917 P.2d 187], the California Supreme Court held that to the extent *Aranda* "constitutes a rule governing the admissibility of evidence, and to the extent this rule of evidence requires the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d))."

deleted portions of his statements that implicated Davis, but that it failed to recognize the prejudice against Stallworth that was worked by the omissions.

██ Stallworth complains that the redaction stripped him of credibility because as a result, his account of events was necessarily incomplete. Specifically, he complains that references to the number of passengers in the Tahoe were insufficient: "The jury knew there was a driver and a passenger in the front seat, and two passengers in the second seat. By removing Davis from the front passenger seat, there were not enough persons in the Tahoe." Stallworth accuses the trial court of ignoring the principle that a defendant's statement shall not be redacted to benefit a codefendant at the cost of prejudicing the defendant. Stallworth concludes that his redacted statements appear false, inconsistent, and evasive, and that the jury must have decided that Stallworth was in the front passenger seat, rejecting his assertion that he was lying down in the back of the Tahoe. We have reviewed the redactions of which Stallworth complains and conclude that the redactions effectively rendered his exculpatory account of the freeway shooting implausible.

Stallworth gave an internally consistent account of the freeway shooting to the police in his statement. According to Stallworth, there were four people in the Tahoe at the time of the shooting: Stallworth, Trotter (known as "Moan"), Davis (known as "Dobey"), and Paul Sheppard (known as "Two-P's"). Stallworth was in the third row seat, lying down. Trotter was driving, Davis was in the front passenger seat, and Sheppard was in the backseat. Stallworth explained it as follows:

"Q. Where, where were you sittin' in, in the truck when it happened?

"A. The truck it's it's the, the front seat. Then there's that middle seat . . . and there's the back seat. I was in the back seat layin' . . . .

"Q, On the driver's side or the passenger side?

"A. No. It ain't no—like, layin' back like this with my legs up. So on both sides.

"Q. You're talkin' about the third seat area?

"Q. All the way in the back?

"A. Yeah. In the third seat. I was . . . laying down.

"Q. . . . so, so, who else was in the car?

"A. Two-P's [Sheppard].

"Q. So Two-P's [Sheppard] had this—the middle portion of the seats all . . . to himself?

"A. And I had the uh, third part, all to myself.

"Q. And, and Moan [Trotter] was in the uh . . . .

"A. Driver's seat.

"Q. And . . .

"A. Dobey [Davis] was in the passenger seat.

"Q. . . . Dobey [Davis] was in the passenger seat.

"A. Yes, sir.

"Q. . . . [S]o what window did they shoot out of?

"A. Their, their window.

"Q. What do you mean? The, the driver's window or the passenger window?

"A. The passenger window. And, and the, the uh, passenger door. Whatever. You know it was . . .

"Q. Behind the passenger . . . .

"A. Yeah, behind the passenger.

"Q. . . . the front passenger?

"A. Behind the passenger.

"Q. Both of 'em?

"A. It's, it's—alright, let me see the, let me see the uh—can I see the picture of the truck?

"[Pause]

"A. See, it's that one and that one. I was back here layin' down. It was Moan [Trotter] over here. Dobey [Davis] right here. Two-P's [Sheppard] got that whole, and I got this whole one to me. I don't know if Two-P's [Sheppard] was laid out or what—you know what I'm sayin'?"

The redactions removed all mention of Davis, and therefore changed the meaning of Stallworth's account to suggest that the passenger seat in the Tahoe was empty—or, if it was not empty, that Stallworth was lying or concealing who was sitting there.

The redactions also altered Stallworth's account of who was shooting and how many weapons there were. When speaking with the police, Stallworth consistently stated that Davis and Sheppard were shooting, and that there were two guns. (Other evidence demonstrated that two guns were used.) But with the redactions, the resultant number of weapons varied and there was only one identified shooter, Sheppard. This is Stallworth's unredacted account:

"Q. Do they normally carry guns or what?

"A. I guess, you know, that night they had a guns, 'cuz I didn't even know they had guns.

"Q. The night of the wedding or . . . the night before [that is, the freeway shooting night]?

"A. The night of the . . . shooting.

"Q. Okay.

"A. I was just in the back. Yeah, I was just in the back.

"Q. But where'd they get the guns from? The night of the freeway shooting, who had the guns?

"A. Uh, Dobey [Davis] and uh, Two-P's [Sheppard] 'cuz they was the shooters. I didn't even know they . . . .

"Q. Okay, where'd they get the guns from?

"A. I don't know, I don't know where they got the guns from. [¶] . . . [¶]

"Q. [W]as it one gun or two?

"A. I guess it's—it had to be two 'cuz both of them was shootin'.

"Q. Did you see both guns?

"A. No, Sir. I didn't even . . . .

"Q. Did you see . . . .

"A. I didn't even see . . . . I'm way in the back part—like the third part. I lay on the way down and I just hear a gang a'shootin'.

"Q. Did you, did you see uh, both of 'em shootin'?

"A. Yes, Sir. At—I didn't see both of 'em shootin' while it was goin' on, but after—you know what I'm sayin'—we got to the uh, to uh, my girl's house, they was like—you know what I'm sayin'—like wipin' it off."

The statement was redacted to remove Davis, so that it appears that Stallworth is speaking only about Trotter and Sheppard, and this is how the jury heard it:

"Q. Do they normally carry guns or what?

"A. I guess. You know that night they had guns. Cause I didn't even know they had guns . . .

"Q. The night of the wedding or the night before?

"A. The night of the shooting.

"Q. Okay.

"A. I was in the back. Yeah. I was just in the back.

"Q. Where did they get the gun from? The night of the freeway shooting? Who had the gun?

"A. Two P's [Sheppard]. I didn't even know . . . .

"Q. Where did they get the gun from?

"A. I don't know. I don't know where they got the gun from. [¶] . . . [¶]

"Q. Was it one gun or two?

"A. I guess it, it had to be two.

"Q. Did you see both guns?

"A. No sir. I ain't even, I ain't even see. . . . So I am like way in the back, like the third part. I lay all the way down. I just heard a gang of shooting.

"Q. Did you see shooting?

"A. Yes, sir. At, uh, I ain't see shooting while it was going on. But after, you know what I am saying, we got to the um, to um, my girl's house, they was like, you know what I am saying, like wiping it off."

When redacted, the question about where the guns came from and who had them was altered to the singular. Stallworth was then left identifying only Sheppard as the shooter. Left intact, however, was Stallworth's answer that there had to be two guns. Not only does that render Stallworth's account internally inconsistent because of the varying representations as to how many weapons were used, but more importantly, the redactions left the revealed identity of the other shooter completely absent. The redaction changed the account from a complete explanation that Davis and Sheppard were the shooters to a partial explanation that there were two guns but that only Sheppard was identified as the shooter.

By removing Davis entirely from the story, and not using a placeholder to indicate that there was a person in his position (done in order to preserve Davis's rights under *Aranda, Bruton* and their progeny) it now appeared that there were only three people in the car—and that Stallworth was claiming that there was no one in the front passenger seat. All of Galbert's substantive accounts of the shooting, however, placed someone in the front passenger seat, and in one account of the event (Galbert's third account) the person in the front passenger seat was one of the shooters. The redactions made Stallworth's account incompatible with Galbert's third description of events—when in fact, except for the question of who the person was in the rear passenger seat, the two stories were actually rather consistent inasmuch as each set forth three visible people in the car, with shooters in the front passenger seat and backseat. The obvious way to reconcile the conflicts between those two stories, conflicts created by the redaction, was to conclude that Stallworth was the front seat passenger and a shooter.[6]

Moreover, Galbert described the person in the backseat as bald, and Stallworth was not bald. Therefore, the omission of Davis from the account

---

[6] A further suggestion that the jury resolved the factual issues this way: the jury deadlocked on all charges against Davis related to the freeway shooting.

led to this: if there were three people in the car (Trotter, Stallworth, and Sheppard), and Stallworth was not in the backseat because a bald person was in the backseat, it was all the more likely that he was filling that spot in the front seat where, in one of Galbert's accounts, one of the shooters sat. The redactions tended to have the impact of making it look like Stallworth was at the very least concealing one of the shooters (or implicitly claiming that the driver was shooting); by inference it seemed that he was lying about where he was in the car and that he probably was the front seat passenger—one of the shooters, if Galbert's account of three passengers and two shooters is believed.

The redactions made Stallworth's story inconsistent with Murphy's testimony as well, because Murphy also described two shooters in the Tahoe. Here again, the alteration of Stallworth's account to identify only one shooter and to refer frequently to one gun resulted in his account being incompatible with this testimony, which further tended to suggest that Stallworth was lying.

Stallworth likens the instant case to that in *People v. Douglas* (1991) 234 Cal.App.3d 273 [285 Cal.Rptr. 609] (*Douglas*), in which prejudicial redactions distorted the defendant's account of his role in a murder and required reversal of his conviction. The Attorney General responds that the cases are different because in *Douglas*, the redactions presented a misleading version of events that actually tended to intimate that the declarant admitted conduct that he actually denied and blamed on his codefendant. The Attorney General is right that the cases are distinguishable to that extent—but at the same time, the case is like *Douglas* in that the end result was that the actual meaning of the statement was fundamentally changed. With the redactions the statement implied that Stallworth meant to suggest that either an empty seat or Trotter shot at Galbert, which is not consistent with Galbert's assertion of a front passenger seat shooter—and it is an allegation that Stallworth never actually made. Stallworth clearly said that Davis, in the front seat, and Sheppard, in the back, did the shooting. In that regard, the redaction did alter the fundamental content of the statement. But also significantly, the redaction enhanced the inculpatory value of the statement because not only did the prosecution receive the benefit of defendant placing himself in the vehicle from which shots were fired, but the prosecution also received the benefit of an altered account of events that no longer dovetailed with other evidence before the jury (unless one concluded that Stallworth was a front seat shooter), suggesting that Stallworth was not telling the truth. For a redacted statement to make it appear that the declarant is evasive or lying in a way that the original statement did not seems to us to be the very definition of prejudice within the meaning of *Aranda, supra,* 63 Cal.2d at page 530. (*People v. Lewis, supra,* 43 Cal.4th at p. 457 ["A defendant is prejudiced in this context when the editing of his statement distorts his role or makes an exculpatory statement inculpatory."].)

██ Here, either the statement should have been excluded in its entirety or the full, unredacted statement should have been admitted under Evidence Code section 356, which provides that "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." As the *Douglas* court observed, " 'It is an elementary rule of law that when admissions of one on trial for the commission of a criminal offense are allowed in evidence against him, all that he said in that connection must also be permitted to go to the jury, either through cross-examination of the witness who testified to the admissions or through witnesses produced by the accused. The fact that declarations made by the accused were self-serving does not preclude their introduction in evidence as a part of his whole statement, provided they are relevant to, and were made on the same occasion as the statements introduced by, the prosecution.' " (*Douglas, supra,* 234 Cal.App.3d at p. 285, quoting 29 Am.Jur.2d, Evidence, § 599, pp. 654–655, fns. omitted; see now 29 Am.Jur.2d (2008) Evidence, § 759.) The use of the redacted statement "set the stage for an inevitable collision between [the codefendant's] constitutional rights protected by the *Aranda/Bruton* decisions and appellant's right to have the jury hear his entire statement as provided in Evidence Code section 356. ██ While *Aranda* offers as an option the redaction of the confession, it expressly limits that option to cases in which deletions are made without prejudice to the declarant. ([*Aranda, supra,*] 63 Cal.2d at p. 530.) When deletions cannot be made without prejudice to the declarant the court should either grant severance or exclude the statement. (*Id.* at p. 531.)" (*Douglas,* at p. 285.)

The Attorney General makes a series of arguments why the meaning-altering redactions did not prejudice Stallworth. First, he contends that it was not the redaction that negatively impacted Stallworth's credibility, it was Stallworth's own lies that negatively impacted his credibility. Certainly there were at least two false assertions made by Stallworth that could easily have impacted the jury's assessment of his credibility: he gave a false name to the police when apprehended, and he first gave an account of witnessing the freeway shooting in which he was not in the Tahoe but was in another car on the scene. However, whether Stallworth's credibility could reasonably be doubted in the absence of the redactions is irrelevant—the point here is that in the statement that Stallworth gave to the police, he gave an exculpatory account, consistent with much of the evidence presented at trial, in which he was present at the scene but was not a shooter or an aider and abettor. The

redactions rendered the account not only incomplete but also implausible, suggesting that this account was false. The redactions robbed the statement of its exculpatory nature and enhanced its inculpatory qualities. That Stallworth's credibility could easily have been questioned independent of the redacted statement is not determinative of whether the deprivation of a plausible defense through redaction is a violation of his due process rights.

Next, the Attorney General argues that the redacted statement is perfectly consistent with Galbert's assertion that there were only three people in the Tahoe. We find it difficult to comprehend how this ostensible consistency tends to remove or counter the prejudice created by the redactions here. In fact, as we have discussed, the fact that Stallworth's altered statement is consistent with this account given by Galbert actually increases the prejudicial impact of the alterations. When Galbert told the police that there were three in the Tahoe, he identified the occupants as a driver, a front passenger, and a rear passenger. He said that the front passenger and the rear passenger shot at his car. So, if there were only three people in the Tahoe, unless Stallworth was the driver (which he denied and which was never suggested by anyone), he had to be one of the two shooters. The redaction to omit one of the four people in the Tahoe, therefore, actually created an artificial confluence between Stallworth's story and this account by Galbert and therefore increased the likelihood that the jury would conclude that Stallworth was one of the shooters.

The Attorney General also argues that the omission of a reference to Stallworth's fear of Davis could not have been prejudicial because of Stallworth's other statements that he was afraid of retaliation for being a snitch. This is fine as far as it goes. Clearly not all of the redactions were prejudicial. But the fact that redactions concerning fear of retaliation appear nonprejudicial does not address the overall prejudice coming from the evisceration of the exculpatory value of Stallworth's statements to the police.

Next, the Attorney General asserts that this was not a case in which the prosecutor charged both defendants and left it to them to convince the jury who was responsible, for here the prosecutor's theory was that both defendants were responsible for the charged offenses. This argument is based on *People v. Cummings* (1993) 4 Cal.4th 1233, 1287 [18 Cal.Rptr.2d 796, 850 P.2d 1], in which the California Supreme Court concluded that the trial court had not abused its discretion when it impaneled separate juries and held a joint trial rather than severing the defendants' trials. The Supreme Court wrote, "That defendants have inconsistent defenses and may attempt to shift responsibility to each other does not compel severance of their trials [citation], let alone establish abuse of discretion in impaneling separate juries. Here . . . the defense positions were antagonistic because the identity of the

killer was disputed by defendants. That each was involved in the incident was undisputed, however, and the prosecution had offered evidence sufficient to support verdicts convicting both defendants. As the People observe, this was not a case in which only one defendant could be guilty. The prosecution did not charge both and leave it to the defendants to convince the jury that the other was that person. Here the prosecution theory was that both defendants participated in, and were guilty of, the murder. Most of the additional evidence each defendant offered to support his attempt to shift blame to the other would have been admissible had the prosecution sought to offer it. In these circumstances there was no abuse of discretion in denying complete severance and no prejudice as a result of joint trial on the murder charge before separate juries." (*Id.* at pp. 1287–1288.) As the full quotation indicates, *Cummings* has no connection to the facts here. The judge did not order separate juries, and Stallworth did not argue that severance was required because the defendants had inconsistent defenses. The mere fact that the prosecutor accused both defendants of being shooters does not demonstrate that the redactions were made without prejudice to Stallworth. This argument does not tend to establish that the redactions were proper or preserved Stallworth's due process rights.

The Attorney General also asserts that "appellant and Davis were not the only eyewitnesses to the crimes. Accordingly, redaction of appellant's statements was not prejudicial." We are uncertain how the fact that other people witnessed the freeway shootings demonstrates that the redactions made to Stallworth's statements were not prejudicial to him.

Finally, the Attorney General argues that Stallworth was perfectly free to implicate Davis through direct testimony, and that therefore even if it was error to admit the redacted statements, the error was not prejudicial. It appears that the Attorney General means to contend that Stallworth, who did not testify at trial, could have taken the stand to testify that Davis was the front seat passenger and one of the shooters. The Attorney General's supporting authority does not support his contention that a defendant may be required to abandon his Fifth Amendment privilege against self-incrimination in order to attempt to undo the prejudice caused by ineffective and misleading redactions to his extrajudicial statements concerning highly probative evidence and the core of his defense. That Stallworth could have elected to testify is not an adequate response to the dilemma that his statement could not be effectively redacted without prejudicing him, which means, pursuant to *Aranda, supra*, 63 Cal.2d 518, that the trials needed to be severed, two juries impaneled, or the statement excluded altogether.

As in *Douglas, supra,* 234 Cal.App.3d at page 287, "The prejudice to him is obvious and serious." If the court had granted the severance motion or impaneled two juries, deletions of Stallworth's statement would not have been required to protect Davis under *Aranda/Bruton.* While the appropriate standard for review of this error is not entirely clear (see, e.g., *People v. Lewis, supra,* 43 Cal.4th at p. 460 [introduction of redacted statement judged "harmless under any standard"]; *Douglas, supra,* 234 Cal.App.3d at p. 287 ["Because the evidence of appellant's involvement in the actual killing of Amey was far from overwhelming, we cannot dismiss this error as harmless."]) we cannot say that the error is harmless. The evidence of Stallworth's involvement in the shooting was not overwhelming. Stallworth was surely one of the four occupants of the Tahoe, both by his own admission and by Galbert's identification of his photograph, but no one ever identified him as a shooter. Before his uncooperativeness began, Galbert identified Stallworth as a rear passenger in the Tahoe, but never asserted that he fired a gun. Stallworth was not bald and did not have a shaved head, which suggests that he was not the backseat shooter that Galbert identified the night of the shooting. The evidence of who was responsible for these shootings was not definitively established; indeed, the jury deadlocked on all the freeway-shooting-related charges against Davis despite Galbert's identification of Davis as the front seat passenger and the fact that he was the owner of the Tahoe. In light of the less-than-compelling evidence and the jury deadlock on the charges against Davis despite the photographic identification of him as a front seat passenger and the evidence that the front passenger was a shooter, there is a reasonable probability that Stallworth, who was identified as a rear passenger but who did not match the description given of the rear passenger who did the shooting, would have obtained a different outcome if his full statement had been presented to the jury. Reversal of his convictions for the October 10, 2003 freeway shootings (counts 1 through 7) is required.[7]

The same cannot be said of the convictions for the altercation on October 11, 2003. Stallworth argues that the redactions were prejudicial to him in this regard as well, because they made Stallworth's conduct that night make little sense and because the removal of a person again made Stallworth appear to be lying. Specifically, Stallworth had told the police that he came with other people in another car, but that when the fight broke out, he hopped into Davis's Tahoe. The police asked how Davis got to the wedding reception, and

---

[7] Our conclusion that the convictions on these counts must be reversed obviates any need to address Stallworth's arguments that (1) the evidence was insufficient to support the gang enhancement findings under section 186.22 with respect to these counts; (2) the sentences imposed on these counts were improper; and (3) the parole revocation fine was improperly imposed in light of the impossibility of parole.

Stallworth answered, "From uh, I guess he drove, 'cuz that's who I left with on the uh—after everybody was fightin' and stuff, I hopped in the car with him and left with him." This was altered so that Stallworth said, "After everybody was fighting I hopped in the car and left." The police showed Stallworth a photo of the Tahoe in which he was apprehended, and asked whose truck it was. Stallworth answered, "I don't, I don't know whose it is, but I, I think it's Dobey's [Davis's], Sir." "Why do you think it's Dobey's?" the police asked. Stallworth answered, "Because he be drivin' it and uh, his homeboy drivin' it too." After redactions, the response was "I don't know whose it is, but homeboy has been driving it." These redactions did not enhance Stallworth's credibility. If the statement had not been redacted, the gist of Stallworth's account would have been that when the fight broke out, he did not want to be a part of it, so he hopped into his friend Davis's Tahoe and left the scene. Instead, Stallworth hopped into a car of unknown ownership with two people whose names he did not know, a less believable account. Moreover, the redactions again made it appear that Stallworth was omitting someone from the car. He was apprehended with Davis, Trotter, and Sherouse; he identified these men to the police by name and/or photograph, but the redactions excised Davis, so it appeared that Stallworth maintained there were only three people in a car that manifestly had four passengers.

Unlike the situation with the freeway shootings, however, these redactions did not fundamentally alter the meaning of Stallworth's statements or interplay with the other evidence in a manner that was prejudicial to Stallworth. These redactions neither distorted Stallworth's role nor converted his statement from exculpatory to inculpatory. (*People v. Lewis, supra*, 43 Cal.4th at p. 456.) The question of three versus four occupants of the vehicle did not tend to make Stallworth appear to be guilty of any offense that he did not otherwise appear to have committed. Redactions concerning the number of passengers and why Stallworth felt the Tahoe was an appropriate vehicle to leave in did not undercut his denial of participation in the beating at the wedding reception. Furthermore, none of the deletions from the statements concerning the freeway shooting distorted the account of this event on the following day. (See *Douglas, supra*, 234 Cal.App.3d at pp. 287–288 [prejudicial redaction errors with respect to murder conviction do not require reversal of accessory conviction where the redactions did not distort the meaning of the statement with respect to conduct after killing].) Unlike the redactions pertaining to the freeway shooting, here the redactions were effective and without prejudice to Stallworth. There is no *Aranda* error here. (*Aranda, supra*, 63 Cal.2d at p. 530 [when the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court may "permit a joint trial if all parts of the

extra judicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant"].)[8]

III. *CALCRIM No. 401*

██ Stallworth next contends that CALCRIM No. 401, concerning liability for aiding and abetting, is constitutionally deficient because "it does not explicitly state that mere presence or mere knowledge is insufficient to establish aiding and abetting." The language of CALCRIM No. 401 demonstrates otherwise. First, CALCRIM No. 401 explicitly states that mere presence is insufficient to establish aiding and abetting: "However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor." Second, CALCRIM No. 401 sets forth the four elements for aiding and abetting liability:

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1. The perpetrator committed the crime;

"2. The defendant knew that the perpetrator intended to commit the crime;

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"AND

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

CALCRIM No. 401 clearly provides that knowledge that the perpetrator intends to commit the crime is only one of the four elements for aiding and abetting liability. If the jury found mere knowledge alone, by the terms of CALCRIM No. 401, that would be insufficient to establish aiding and abetting liability. This point is even emphasized by the portion of the instruction that reads as follows: "Someone *aids* and *abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (CALCRIM No. 401.)

---

[8] We do not review the sufficiency of the evidence to support the section 186.22 gang enhancements attached to the causes of action pertaining to the wedding reception incident because Stallworth did not appeal the imposition of gang enhancements on these counts.

Stallworth also appears to argue that the instruction should have made reference to the standard of proof, complaining that the instruction does not discuss the requirement that the prosecutor prove knowledge and intent beyond a reasonable doubt. We observe that the jury was instructed with CALCRIM No. 220, which, as given, provides, "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove each element of a crime and special allegation beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." The jury was instructed to consider the instructions as a whole. (CALCRIM No. 200.) Stallworth has not demonstrated any error in CALCRIM No. 401.

## IV. *CALCRIM No. 1401*

█ Stallworth next contends that CALCRIM No. 1401, a jury instruction concerning a felony committed for the benefit of a criminal street gang, is defective because it does not include section 186.22, subdivision (b)'s requirement that the crime be committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." CALCRIM No. 1401 requires the People to prove that in committing the felony, "[t]he defendant intended to assist, further, or promote criminal conduct by gang members." Apparently, then, the failure is not a failure to describe the intent, as the instruction's words "assist," "further," and "promote" directly track the statutory language; the alleged failure is the absence of the word "specific."

█ We reject the argument that the absence of the word "specific" from the explicit definition of the requisite mental state somehow establishes that the instruction, as Stallworth contends, "omitted the element of specific intent." The element of specific intent does not depend on the use of the word "specific," but on the element of a particular intention, defined in the relevant statute, that goes beyond "the general blameworthy state that is required in any true crime." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 5, p. 204.) Characterizing crimes as specific or general in intent has " 'little meaningful significance' " in instructing the jury, the California Supreme Court has said; what matters is that the jury receive an accurate description of the required state of mind. (*People v. Hering* (1999) 20 Cal.4th

440, 447 [84 Cal.Rptr.2d 839, 976 P.2d 210] [" 'The critical issue is the accurate description of the state of mind required for the particular crime.' "].) Here, the jury instruction made clear the precise intent that defendant had to be found to have in order to find the enhancement true: Stallworth had to have harbored the intent to assist, further, or promote criminal gang activity through the felony he committed. Although the word "specific" was not affixed, the jury instruction's description of the necessary intent is an accurate, exact representation of the intent required by section 186.22, subdivision (b). There is no reasonable likelihood that the instruction failed to convey to the jury the nature of this element of the gang enhancement allegation.

## DISPOSITION

The convictions on counts 1 through 7 are vacated and the matter remanded to the trial court for further proceedings. In all other respects, the judgment is affirmed.

Woods, J., concurred.

**PERLUSS, P. J.**, Dissenting.—I respectfully dissent from the majority's decision to reverse Timothy Stallworth's convictions for murder, attempted murder (three counts) and shooting at an occupied motor vehicle (three counts) in connection with the October 10, 2003 freeway shootings.

In its recent opinion in *People v. Lewis* (2008) 43 Cal.4th 415 [75 Cal.Rptr.3d 588, 181 P.3d 947] (*Lewis*) the California Supreme Court explained, "Severance may be necessary when a defendant's confession cannot be redacted to protect a codefendant's rights without prejudicing the defendant. [Citation.] A defendant is prejudiced in this context when the editing of his statement distorts his role or makes an exculpatory statement inculpatory." (*Id.* at p. 457.) The redactions here neither distorted Stallworth's role in the murder and attempted murders on October 10, 2003 nor made his exculpatory statement inculpatory—in both the original and redacted versions he insisted he was lying down in the far backseat of the Tahoe, did not participate in the shootings and was unaware his associates were armed until he heard the gunfire. Accordingly, I do not believe it was prejudicial to jointly try Stallworth and Myron Davis and to permit Stallworth's redacted statement to be read to the jury.

To be sure, redacting Stallworth's account of the freeway shootings to remove all references to Davis made the statement somewhat less coherent—although the original, unredacted statements are themselves difficult to follow and internally inconsistent, at least in part. Accordingly, it may well have

been better to try the two men separately or for the trial court to have impaneled separate juries to hear the cases. But the relatively minor problems created by the redactions do not satisfy the definition of prejudice set forth in *Lewis* and, in my view, did not make Stallworth's trial fundamentally unfair, requiring reversal of the convictions.

The majority's contrary conclusion—"that the redactions effectively rendered his exculpatory account of the freeway shooting implausible"—rests on two principal points. First, the redacted statement unfairly exposed Stallworth's credibility to challenge because it contained varying representations about the number of shooters and the number of guns they used. Second, by removing all mention of Davis, Stallworth's statement suggested the front passenger seat was empty, or if not empty, Stallworth was lying or concealing who was sitting there.

As to the first point, although the redacted statement plainly does not identify the second shooter—Stallworth's codefendant Davis—it leaves no doubt that there were two guns used by two shooters and that Stallworth claimed he was not one of them. Specifically asked, "Was it one gun or two?," Stallworth responds, "I guess it, it had to be two." When asked about "Two-P's" role in the incident, Stallworth unequivocally states, "He was one of the shooters"—necessarily implying there was also a second shooter. Moreover, Stallworth repeatedly refers to the men with the guns in the plural, stating, "that night they had guns"; "I didn't even know they had guns"; after the shooting at Stallworth's girlfriend's house, "they was . . . wiping [the weapon] off"; and "they did that stupid stuff. Jeopardize my life."

As to the second point, the majority concedes the redacted statement remained exculpatory. Stallworth emphatically states, "y'all accused me for something I didn't do" and repeatedly makes similar denials of involvement or culpability. From the other testimony introduced at trial, there could be no serious question the second shooter was in the front passenger seat. In the redacted statement Stallworth is never asked who occupied that seat (or even whether it was occupied); he never asserts there were only three individuals in the Tahoe (although he identifies only two others by name); and he gives no responses that suggest he is trying to conceal the identity of the second shooter. Use of a neutral placeholder name, rather than complete omission of Davis, would have allowed Stallworth's statements to appear somewhat more complete (although they may have then improperly incriminated Davis), but I simply cannot agree with the majority's conclusion the redacted version of events—including Stallworth's denial of knowledge or involvement in the shootings—was any more implausible than the unredacted statement.

As was true in *Lewis, supra*, 43 Cal.4th at page 458, "the trial court did not prevent [Stallworth] from cross-examining the witnesses to bring out his own hearsay statements that exculpated him or lessened his own role in the crimes. Nor . . . did the trial court prevent [Stallworth] from presenting nonhearsay testimony or evidence that implicated his codefendants. [Citation.] Rather, the trial court precluded defendant only from bringing out his own hearsay statements that expressly inculpated his codefendants. These limits were permissible notwithstanding Evidence Code section 356."

Accordingly, I would affirm the judgment in its entirety.

On July 14, 2008, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 16, 2008, S165149.