Filed 6/7/13  P. v. Jones CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RAVEN JONES, JR.,<br><br>Defendant and Appellant. | C068258<br><br>(Super. Ct. No. 10F07007) |

Defendant Raven Jones, Jr., was part of a group of young men who committed three residential burglaries on an October night in Folsom.  They were caught attempting to break into a fourth house.  When police arrived, defendant was in the front passenger seat of codefendant Perry Aquino's car, which was parked in front of the house.  Aquino was on the porch.  Another man, Jeffrey Santos-Green, was alleged to have been part of the group.  He was found about a mile away, walking through a parking lot in the rain, and was believed to have jumped the back fence when defendant and Aquino were arrested.  Property taken during the three burglaries was found in Aquino's car.

1

Defendant and Aquino were convicted by jury of three counts of first degree burglary and one count of attempted first degree burglary. The trial court sentenced each man to state prison for an aggregate term of five years and four months.[1]

On appeal, defendant asserts: (1) there was insufficient evidence to prove that he either directly perpetrated or aided and abetted the commission of the burglaries and attempted burglary; and (2) the trial court prejudicially erred in declining his request to instruct the jury with certain language from CALJIC No. 3.01 on aiding and abetting. We disagree. As we explain, the record contains substantial evidence defendant aided and abetted the commission of the crimes. We also conclude the jury was appropriately instructed with CALCRIM No. 401 on aiding and abetting. Accordingly, we affirm the judgment.

FACTS

On October 23, 2010, at about 10:30 p.m., Glenda Harr was alone in her upstairs bedroom when the doorbell rang. Not expecting any visitors, Harr went to her office and looked out the window to see who was at her house. As she looked out the window, someone "started pounding on [her] door." Through the rain, she saw a "grayish" sedan parked in front of the house. Harr testified there were "two or three" young men "exiting that car and returning back to the car and exiting the car and that kind of thing." She continued: "[T]hey were entering and exiting out of different car doors. And so they were going across the street. They were -- I could see someone exiting my front door and going back to the car. And then I saw somebody else get out and go across my driveway. And I could tell they were probably going in my backyard or the neighbor['s backyard]." Feeling "a little panicked" and "very outnumbered," she called 911.

_____

[1] Santos-Green was tried with defendant and Aquino and found to be not guilty.

2

Harr told the emergency dispatcher: "[T]he one passenger got out and came to the back of my house. And the other one now is parked (whispers) by the car." After describing the car, Harr continued: "Well, the one person hasn't come back from the side of my house, so I don't know if they're breaking in." A short time later, Harr said: "[S]omebody just went back in the car" and clarified that this person got into "the passenger side" of the car. Harr then told the dispatcher that she was hearing noises coming from her backyard patio and left the window to try to hear them more clearly. When she returned to the window, Harr said: "That one came back and he left." The following exchange then took place between Harr and the dispatcher: "[Harr:] And again, the driver side is open. [¶] [Dispatcher:] The driver side door is open? [¶] [Harr:] Oh my gosh, yes and they're coming to the side of my house. This one's coming to the side too -- [¶] [Dispatcher:] They're coming to the side of the house? [¶] [Harr:] Yes! Yes! Yes! Like in my backyard. Oh, no!" After the dispatcher assured Harr that a police unit was approaching the house, Harr yelled: "They broke the window! They're in!"

Officers with the Folsom Police Department parked a short distance from Harr's house. As the officers approached the scene on foot, they were advised by dispatch that a window had been broken. Closing the distance between themselves and the house in a matter of seconds, the officers found Aquino standing behind a pillar on Harr's front porch and took him into custody. They then found defendant seated in the front passenger seat of the sedan, which was owned by Aquino, ordered him out of the car, and also took him into custody. Believing there to be a third person involved in the attempted burglary, officers searched Harr's backyard, but found no one.[2] They did find that the

---

[2] The belief that a third perpetrator was in the backyard stemmed from the following facts: (1) the officers could see the house when they received the dispatch about the

3

back door's window pane had been shattered by a large rock. The backyard abutted a golf course. Officers shined their flash lights over the back fence, but did not see anyone on the course.

After clearing the backyard and making sure the house was also free of intruders, one of the officers took Harr's statement. Harr explained that before the officers arrived, she watched one of the young men "get into the front passenger seat." She also explained that she saw "two or three individuals" getting "in and out of that car." In her trial testimony, she confirmed that "somebody came in and out [of] at least three of the doors of the vehicle," and that someone got in and out of the passenger side "a couple times." However, at trial, she could not say for sure whether this person got into the front or rear passenger seat.

Officers searched Aquino's car and found property that had been taken from three other houses that night. The burglarized houses were in close proximity to each other. In each of these burglaries, the intruders gained entry by breaking a window. We also add that the police dog handler who assisted in the search of Harr's backyard was called to the scene of one of the other burglaries. On the way, about a mile from Harr's house and on the other side of the golf course, the officer found Santos-Green walking through the parking lot of an Alzheimer's care facility. He was wet and had grass on his shoes and pants. Defendant, Aquino, and Santos-Green were each from the Fairfield area.

---

broken window; (2) they did not see anyone run from the backyard to the front of the house; and (3) they did not believe either defendant or Aquino could have broken a window in the back of the house because they were taken into custody in the front of the house within seconds of the dispatch concerning the broken window.

4

## DISCUSSION

## I

### *Sufficiency of the Evidence*

Defendant contends there is insufficient evidence to support his burglary and attempted burglary convictions. Specifically, defendant argues: "All the prosecution proved here was that [he] was in the company of the burglars and undoubtedly knew what they were up to. But this alone is not a crime. The prosecution had to produce substantial evidence that [defendant] had some intent to commit the crimes, or to aid or support in their commission. And the prosecution produced no evidence whatsoever to prove that fact." We disagree.

"'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].) The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.'" (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

"Every person who enters any house . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." (Pen. Code, § 459.) "Every burglary of an inhabited dwelling house . . . is burglary in the first degree." (Pen. Code, § 460.) "An attempt to commit a crime requires the specific intent to commit the target crime . . . and a direct but ineffectual act, beyond mere preparation, done towards its commission." (*People v. Booker* (2011) 51 Cal.4th 141, 175.) Defendant does not dispute that the prosecution proved three first degree burglaries and one attempted first degree burglary were committed the night of October 23, 2010. Nor does he dispute he was in the company of the burglars as the crimes were being committed and had knowledge of their criminal purpose.

"Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, citing Pen. Code, § 31.) "'[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Gonzales* (2011) 52 Cal.4th 254, 295-296, quoting *People v. Beeman* (1984) 35 Cal.3d 547, 561.) Thus, while the prosecution did not prove defendant was the one who rang Harr's doorbell, or pounded on her door, or ran across her driveway and into her backyard, or broke the back door's window pane with a rock, he is nevertheless guilty of attempted burglary if the prosecution proved, by direct or circumstantial evidence, that he aided or encouraged the commission of the crime with knowledge of his companions' unlawful purpose and with the intent to commit, encourage, or facilitate the commission of the crime. And if the prosecution proved defendant aided and abetted the commission of this

6

attempted burglary, a reasonable inference arises that he also aided and abetted the three burglaries committed prior to their arrival at Harr's house.

"Whether a person has aided and abetted in the commission of a crime is a question of fact, and on appeal all conflicts in the evidence and attendant reasonable inferences are resolved in favor of the judgment. Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5, fn. omitted; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

In *People v. Guzman* (1996) 45 Cal.App.4th 1023 (*Guzman*), the burglary victim (Hansen) looked out his window and saw four men (including Guzman) and a child standing next to a truck that was pulled up to his open garage door. In the truck bed was his son's motorcycle, which had been in the garage. Seeing Hansen, the burglars fled in the truck. Hansen gave chase, wedged the truck to a stop against a hillside, and got out of his vehicle. The burglars also got out. Guzman stood next to the child while two of the other men beat up Hansen. One of these men moved Hansen's vehicle out of their way. The burglars again drove off in the truck. A few seconds later, Hansen got up and resumed his pursuit, eventually cornering the truck at a dead-end street near the freeway. Except for Guzman, the burglars fled on foot. Police officers, who witnessed the tail end of the chase, followed Hansen to the dead-end street and arrested Guzman. One of the other burglars was apprehended on the other side of the freeway. (*Id.* at pp. 1025-1026.) Finding sufficient evidence to convict Guzman of burglary as an aider and abettor, the Court of Appeal explained that Guzman "was with [the burglars] when they pulled up to a stranger's open garage in a hillside residential area and stole a motorcycle out of the garage," he "stayed with them throughout the chase, even though he had the opportunity to stay behind when Hansen stopped the burglars [the first time] and could have demanded they stop and let him out," and he "may well have stayed behind when the

7

burglars were cornered near the freeway since he was too intoxicated or confused to flee with the others." (*Id*. at p. 1027.) Thus, Guzman's presence at the scene of the burglary and his conduct after the crime was discovered supplied sufficient circumstantial evidence he aided or encouraged the commission of the crime with knowledge of the burglars' unlawful purpose and with the intent to commit, encourage, or facilitate the commission of the crime.

Here, the evidence that defendant aided and abetted the burglaries and attempted burglary is more substantial than that existing in *Guzman, supra,* 45 Cal.App.4th 1023. Like *Guzman*, defendant was with a group of men who pulled up to a stranger's house to commit a burglary. But unlike *Guzman*, here, we have additional evidence defendant knew the criminal purpose of his companions prior to arriving at Harr's house. First, by the time the burglars pulled up to the house, they had already committed three burglaries. After the first burglary, there can be no doubt defendant knew the criminal purpose of that night's excursion. Second, there is circumstantial evidence that, even before the first burglary, defendant knew he was in for a night of burglary. He and Aquino (and Santos-Green) lived in the Fairfield area -— nowhere near Folsom. From the fact they were discovered in Folsom, late at night, in the middle of a rain storm, having committed three burglaries and in the process of committing a fourth, the jury could reasonably infer they drove from Fairfield to Folsom for the purpose of committing burglaries. Thus, similar to *Guzman*, where Guzman's conduct *after the crime was discovered* (i.e., fleeing with the burglars without staying behind when stopped or asking to be let out) supplied circumstantial evidence he shared his companion's criminal purpose, here, defendant's conduct *prior to and during the crimes* (i.e., driving from Fairfield to Folsom with the burglars and remaining with them while they committed three burglaries and attempted to commit a fourth) also supplies an inference that defendant shared his companions' criminal purpose.

8

Based on *Guzman, supra,* 45 Cal.App.4th 1023, the foregoing circumstances would be enough to support defendant's convictions. But the prosecution supplied an additional piece of evidence. Unlike *Guzman*, where Hansen did not see the burglars taking the motorcycle from his garage, here, Harr described the actions of the burglars as they attempted to break into her house. She explained there were "two or three" young men "exiting [Aquino's] car and returning back to the car and exiting the car and that kind of thing." She continued: "[T]hey were entering and exiting out of different car doors. And so they were going across the street. They were -- I could see someone exiting my front door and going back to the car. And then I saw somebody else get out and go across my driveway. And I could tell they were probably going in my backyard or the neighbor['s backyard]." She later confirmed that "somebody came in and out [of] at least three of the doors of the vehicle," and further explained someone got in and out of the passenger side "a couple times." At trial, she could not say for sure whether this person got into the front or rear passenger seat. However, in her statement to police, she said she watched one of the young men "get into the front passenger seat." This was consistent with her statements to the 911 dispatcher. During that call, Harr stated: "[S]omebody just went back in the car" and clarified that this person got into "the passenger side" of the car. A short time later, she described the driver (presumably Aquino) and another man coming to the side of her house, and shortly thereafter the back door window pane was broken. Police arrived within seconds and found Aquino on the front porch and defendant seated in the front passenger seat.

From this evidence, the jury could reasonably conclude defendant was the person Harr saw getting into the front passenger seat. Indeed, that is where defendant was found within seconds of the back door's window pane being broken. The fact he had to "get into" that seat, leads to the inexorable conclusion he was outside the vehicle before he got in, which would also be consistent with Harr's statement that "somebody came in and out

9

[of] at least three of the doors of the vehicle." And from the fact Harr saw "two or three" young men doing various things outside the car, e.g., running across the street and then back to the car, going across her driveway and into either her backyard or her neighbor's backyard, walking from her front door to the car after ringing the doorbell and pounding on the door, the jury could reasonably conclude defendant was doing one of these things prior to getting into the passenger seat. Thus, contrary to defendant's argument on appeal, there is evidence he did something "other than to sit in Aquino's car while Aquino and his companion(s) committed a string of burglaries."

We conclude there is sufficient evidence that is reasonable, credible, and of solid value, that defendant aided or encouraged the commission of the burglaries and attempted burglary with knowledge of the burglars' unlawful purpose and with the intent to commit, encourage, or facilitate the commission of the crimes.

## II

### *Instructional Error*

We also reject defendant's assertion the trial court prejudicially erred in declining his request to instruct the jury with certain language from CALJIC No. 3.01 on aiding and abetting.

The jury was instructed with CALCRIM No. 401 on aiding and abetting: "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] . . . [¶] 3. Before or during the commission of the crime [*sic*] the defendant intended to aid and abet the perpetrator in committing the crime; and, [¶] 4. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he [or she] knows of the perpetrator's unlawful purpose and he [or she] specifically intends to and does in fact, aid, facilitate, promote, encourage or instigate the

10

perpetrator's commission of that crime.  If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.  [¶]  If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime [*sic*] you may consider that fact in determining whether the defendant was an aider and abettor.  However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself make him [or her] an aider and abettor."

The trial court declined defendant's request that the jury also be given the following language from CALJIC No. 3.01:  "Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.  [¶]  Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."  Defendant argues this was error because the CALJIC language "states affirmatively that 'mere presence . . . does not amount to aiding and abetting, [and] mere knowledge . . . does not amount to aiding and abetting,'" while the CALCRIM language "is highly equivocal" and "subtly invites jurors to switch the presumption.  It says that if the defendant was present, 'you _may_ consider that fact in determining whether the defendant was an aider and abettor,' then suggests that this '_by itself_' is not enough."  This argument fails for several reasons.  First, the CALCRIM language is not equivocal.  It is simply a more complete statement of the law than defendant would prefer.

Second, contrary to defendant's argument, CALCRIM No. 401 does not contain a "presumption" in favor of finding aider and abettor liability.  Instead, it accurately informs the jury that certain circumstances, i.e., presence at the scene of the crime and failure to prevent the crime, may be considered in determining whether defendant was an aider and abettor.  The instruction then appropriately cautions the jury that these facts alone do not establish aider and abettor liability.  This is an accurate statement of the law.

11

(See *People v. Durham* (1969) 70 Cal.2d 171, 181 [presence at scene of crime or failure to prevent crime are circumstances that can be considered by jury in determining whether defendant was an aider and abettor, but neither circumstance necessarily makes him or her an aider and abettor].)

Third, defendant's requested language from CALJIC No. 3.01 is duplicative. As the Court of Appeal explained in *People v. Stallworth* (2008) 164 Cal.App.4th 1079: "CALCRIM No. 401 explicitly states that mere presence is insufficient to establish aiding and abetting: 'However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.'" (*Id*. at p. 1103.) Moreover, "CALCRIM No. 401 clearly provides that knowledge that the perpetrator intends to commit the crime is only one of the four elements for aiding and abetting liability. If the jury found mere knowledge alone, by the terms of CALCRIM No. 401, that would be insufficient to establish aiding and abetting liability. This point is even emphasized by the portion of the instruction that reads as follows: 'Someone *aids* and *abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.'" (*Ibid*.)

Finally, rule 2.1050 of the California Rules of Court provides that "[t]he California jury instructions approved by the Judicial Council [i.e., CALCRIM] are the official instructions for use in the State of California." (Cal. Rules of Court, rule 2.1050(a).) Moreover, the "Guide for Using Judicial Council of California Criminal Jury Instructions (CALCRIM)" advises: "The CALJIC and CALCRIM instructions should *never* be used together. While the legal principles are obviously the same, the organization of concepts is approached differently. Mixing the two sets of instructions into a unified whole cannot be done and may result in omissions or confusion that could severely compromise clarity and accuracy." (Use Guide to CALCRIM Instructions (2012) p. xxvi.) Thus, the trial

court properly declined defendant's request to supplement CALCRIM No. 401 with the language from CALJIC No. 3.01.

### DISPOSITION

The judgment is affirmed.


                                           _____HOCH_____ , J.


We concur:


_____ROBIE_____ , Acting P. J.


_____MURRAY_____ , J.