Filed 5/17/16  P. v. Melgoza CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSE MELGOZA,<br><br>Defendant and Appellant. | F068797<br><br>(Kern Super. Ct. No. BF148767A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Trinidad Ortiz was murdered on the night of September 22, 2012. The murder investigation focused on appellant/defendant Jose Melgoza and his half brother, George (Jorge) Chavez. The police obtained search warrants to wiretap cell phones linked to defendant and Ortiz. The wiretaps revealed conversations that implicated defendant in the murder. As the investigation drew near defendant and Chavez, defendant called Jose Rizo and told him to get rid of the "burner." Defendant, Chavez, Rizo, and Ortiz were members of the Colonia Bakers gang. The murder weapon was found at Rizo's house. Based on a DNA profile obtained from the murder weapon, Rizo and Chavez were excluded as possible contributors, but defendant could not be excluded.

Defendant was convicted of count I, first degree premeditated murder of Ortiz (Pen. Code, §§ 187, subd. (a), 189),[1] with firearm and gang enhancements (§ 12022.53, subds. (d), (e)(1); § 186.22, subd. (b)); count II, felon in possession of a firearm (§ 29800, subd. (a)(1)), with a gang enhancement; and count III, active participation in a criminal street gang (§ 186.22, subd. (a)(1)). He was sentenced to 50 years to life.

On appeal, defendant contends the court should have granted his motion to unseal the confidential portions of the search warrant affidavits, reveal the identities of the confidential informants, and traverse the search warrants for the wiretaps. He also challenges the instructions for aiding and abetting and the gang allegations, and whether the gang enhancement was supported by substantial evidence. We affirm.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

FACTS

## SEPTEMBER 22, 2012

### The murder

On the evening of September 22, 2012, Joseph Contreras was standing outside his house on the 2100 block of Monterey Avenue. He noticed a man walk by his house. A small black car appeared on Monterey Avenue and stopped next to the man for "[a] second or so." The man stood next to the passenger side of the car. No one got out of the car. Contreras suddenly heard four or five gunshots, and the car left the area.

At 8:37 p.m., Contreras called 911 and reported someone had just been shot and was dying. He said a guy was walking down the street, a black car drove up and stopped next to the man, and the man was shot. Contreras said he did not see how many people were in the car and added: "I guess there's two guys in the car" because "I guess he shot from the right side – the passenger side." Contreras said the man "was looking back" when he was shot. He thought the black car could have been a Nissan.

Deputy Almanza of the Kern County Sheriff's Department responded to the scene within a minute of the dispatch. He found Trinidad "Scooby" Ortiz lying on his back in a puddle of blood.

Ortiz had been shot five times in the back. He was unresponsive. He was taken to the hospital where he died from the gunshot wounds.

There were 8 nine-millimeter shell casings found in the street near Ortiz's body. All the casings had the same head stamps. A black butane torch lighter, a black "NY" baseball cap, blue and white bloody clothes, and a clear plastic bag were also found on the street. The bag contained a white substance of suspected narcotics.

### Contacts between defendant, Chavez, and Rizo

Law enforcement investigators obtained search warrants for forensic evidence and wiretaps on certain cell phones. The two target cell phone numbers subject to the wiretap

warrants were associated with defendant (661-859-3637) and his half brother, George "Jorge" Chavez (661-281-7629).

The wiretaps revealed the following communications on the night of the murder. At 7:42 p.m. on September 22, 2012, there was a two-minute call from Chavez's cell phone to Jose Rizo's cell phone.

At 8:33 p.m., a 46-second call took place between the cell phone numbers assigned to Chavez and defendant.

Around 8:34 p.m., about three minutes before the 911 call, there were attempted contacts between defendant's phone and Chavez's phone.

At 8:37 p.m., the bystander called 911 to report the murder.

The call detail reports placed the cell phone number associated with defendant near 2113 Monterey at the time of the shooting.

At 8:57 p.m., there was a call from Chavez's cell phone to defendant's cell phone. A portion of this call bounced off the cell tower near Rizo's house. There were four calls subsequently placed between the cell phones of Chavez and Rizo.

Defendant's cell phone registered multiple calls between 10:09 p.m. and 10:24 p.m., which hit cell phone towers that covered the county fairgrounds.[2]

## OCTOBER 9, 2012

### Arrest of Chavez

At 7:35 p.m. on October 9, 2010, Officer Harless conducted a traffic stop on Chavez and arrested him on a felony warrant for a probation violation. Chavez was wearing a Chicago Bulls cap with the letters "CB," which Harless believed meant the Colonia Bakers gang. Harless seized a Glock 2340-caliber semiautomatic handgun from Chavez and a jar of marijuana. Chavez also had two cell phones. The firearm was not the murder weapon.

---

[2] As we will discuss below, defendant and his mother discussed using his alleged presence at the county fair as an alibi.

**Defendant's possession of the cell phones**

When Chavez was arrested, one of the two cell phones found in his possession had the number 661-281-7629.

Chavez remained in custody for the duration of the investigation into Ortiz's homicide. Krystal Garza (Garza), defendant's girlfriend, testified that after his arrest, Chavez contacted Elva Cortez Rayas (Rayas), the mother of both defendant and his half brother, Chavez. Chavez told Rayas that she needed to obtain another cell phone with the same number.[3]

Garza testified that from October 25 to 28, 2012, defendant had possession of a new cell phone with Chavez's number of 661-281-7629. Garza testified that she shared a cell phone with defendant that he regularly used.

As noted above, the sheriff's department obtained search warrants for wiretaps on these two target cell phone numbers: 661-859-3637 and 661-281-7629.

**Defendant calls Rayas**

Garza testified that on October 24 and 25, 2012, defendant was in a residential drug treatment program.

At 4:53 p.m. on October 25, 2012, defendant used one of the target cell phones and called Rayas, his mother from the treatment center. The conversation was monitored by the wiretap.

Defendant and Rayas talked about Chavez's arrest. Rayas said she went to Chavez's court hearing, the marijuana sales charge had been dropped, but he still had the gun charge. Defendant said Chavez would have a hard time because of the gun.

Rayas told defendant that "Smalls" already got out of jail and had called Garza's phone. Defendant said he needed the number for Smalls because "I have a hell of a lot of

---

[3] Krystal Garza testified as a defense witness.

people that need taken care of," he had "about 1/2 a pound sold of work but I don't have the means. I don't have anyone on the outside," and he had not been let out yet. Defendant said he might get a pass to go to court the next day, and he would "act like it took a long time at court. To do something there outside."

Defendant said he did not know what was going to happen at court, and he would leave if they gave him a hard time. Rayas suggested that he leave for Mexico. Defendant said he would not go to Mexico, but he would hide out, make a little money, and then leave "because they are going [to] give me some good time."

Defendant admitted he was using drugs again. Rayas became upset and asked if it was heroin, and defendant said yes.

> "[Rayas]: [B]ut hopefully you get rid of that habit son … because we will mess up our own lives son … I can't believe all you were going through and you started to do that…
>
> "[Defendant]: I know … but I did…
>
> "[Rayas]: No, you need lots more experience … like Jorge … *how many times did I tell you guys not carry a gun* … remember … I told you too … you didn't listen … right?
>
> "[Defendant]: *Since we went and killed that fool* … *I put my gun away* … *my gun is still put away*…
>
> "[Rayas]: No more … no more … never again…
>
> "[Defendant]: *My gun has not come out* … *I want you to know and understand that even though I was all f[**]ked up* … I still wanted to change and work and do whatever I could." (Italics added.)

**Detective Conner contacts defendant's mother**

At 5:30 p.m., Detective Conner went to Rayas's house and spoke to her. Conner told Rayas he was a homicide detective, he was looking for defendant, and he needed to talk to him. Conner left his card and asked Rayas to tell defendant.

**Detective Conner contacts Chavez**

At 7:30 p.m. on the same day, Detective Conner went to the Lerdo facility and interviewed Chavez, who was still in custody. He asked Chavez if he knew what happened to Trinidad Ortiz.

Within a short time, Conner's visits to Rayas and Chavez triggered a series of calls between defendant, Chavez and Rizo.

**Rayas tells defendant about the detective's visit**

At 7:53 p.m., defendant called Rayas. Rayas told defendant that a detective and two officers "came looking for you" to ask questions about "[a] dead guy." Defendant asked if he was the "primary suspect," and if they asked for Chavez or him. Rayas said they wanted to ask him questions about a dead guy.

> "[Defendant]: …With those types of cases they are not going to ask me questions they are going to want to arrest me… That's why – If they went to the house and they said I am a suspect…

Rayas said defendant had proof he was at the fair and asked who saw him there. Defendant said they were "going to have to bury me and I have to fight the case." Defendant added: "I was going to leave here now and hide." Rayas said they would follow him, and it would look guilty to run. Rayas told defendant to call the officer tomorrow and tell him he was at the fair. Defendant said no, and that he would call Rayas back.

**Defendant calls Rizo about the "burner"**

At 8:04 p.m., defendant called Jose Rizo. Rizo asked who it was. Defendant said it was "Little [G]uy." Defendant asked Rizo where he was. Rizo said he was by the southwest.

> "[Defendant]: "Hey fool, do you still have the burner … the other one dude?
>
> "Rizo: Yes … fool.

7.

"[Defendant]:       *Um … because we are going to need to throw it away fool.*

"Rizo:       You want to throw it away?

"[Defendant]:       Yes … fool.

"Rizo:       Oh … how do you want to do it or what?

"[Defendant]:       When are you going to be home?

"Rizo:       In a little bit.

"[Defendant]:       *Fool my mom said a homicide detective came.*

"Rizo:       Uh huh.

"[Defendant]:       *And she told me they wanted to talk to me because I am a suspect in the death of that fool.*

"Rizo:       Really?

"[Defendant]:       Yeah.

"Rizo:       *Oh … because I have it well hidden fool.*

"[Defendant]:       All right … if not tomorrow or ….

"Rizo:       *Do you want me to move it somewhere else?*

"[Defendant]:       Nah, it's cool right there … just leave it there.  Are you going to be at your house in the morning?

"Rizo:       Yes dude.

"[Defendant]:       I will go by there early fool.

"Rizo:       Okay … I was going to say that if you want I could stash it real good fool … I could take it to my sister or something.

"[Defendant];       Nah, just be at your house early and then I will go by there and go pick [unintelligible] off."

8.

**Rayas calls defendant**

At 8:08 p.m., Rayas called defendant. She reported that Chavez called her and said the detective had been out to see him.

Rayas passed along several messages from Chavez to defendant. Chavez wanted defendant "just to make a good zipper … that's it." Chavez said "everything is fine … just close the deal … he already closed." Chavez wanted defendant to "just tell them you don't know anything you were at the fair and you found out through the news… Okay?" Defendant agreed.

Rayas again said that Chavez wanted defendant "just to close your zipper real good" because "they don't have any convincing" proof and "[t]hey're just doing a half-assed job." Rayas added that defendant should "[b]e real firm and look at their face and don't get nervous … that is what Jorge [Chavez] told me right now."

**Chavez calls defendant**

At 8:27 p.m., Chavez called defendant from jail, and told defendant not to say anything and to "[z]ip your zipper." Chavez said they had talked to him. Chavez and defendant discussed whether defendant should flee. Chavez asked defendant about the location of his cell phone. Defendant said he had it with him. Chavez said he needed some numbers from the cell phone.

Chavez told defendant he had to think straight, get tough, talk to their mother, not panic, and "flee like a goat."

**Rayas and defendant talk about fleeing**

At 9:07 p.m., Rayas called defendant. Rayas told defendant that she thought he could go to Iowa and stay with his uncle. Rayas said he needed to get his papers, and Garza could pick up a suitcase with his clothes. Defendant agreed.

Garza testified defendant walked out of the treatment program with her on October 25, 2012.

9.

**Defendant calls Rayas**

At 9:40 a.m. on October 26, 2012, defendant called Rayas from his "father-in-law's" house. Rayas told defendant to stay there until she reached "Javier," apparently referring to his uncle in Iowa. Rayas said defendant's father had called, she told him "what happened," and his father wanted defendant to flee to Mexico.

Rayas told defendant to use a cigarette to burn off the tattoo that was on his face, even if it left a scar. Defendant agreed. Rayas told defendant not to leave his location, and she would see what was going to happen to Chavez. Rayas was going to tell Javier that defendant needed to leave because there were no jobs in Bakersfield.

At 10:13 a.m., defendant called Rayas (661-316-9378). Rayas wanted to know if defendant's girlfriend was involved. Defendant replied, "No … *they just said they saw me in her car*," but "she is not involved in none of that." (Italics added.) Defendant and Rayas talked about how he should leave and decided he should take the train to avoid detection.

At 2:38 p.m., Rayas called defendant (661-859-3637) and passed along more messages from Chavez. Chavez wanted defendant to stay off the streets because they were looking for him. Defendant said he knew that.

Defendant and Rayas discussed whether he could buy "Lupe's" papers so he could get a job, and whether Lupe had a clean record, because he knew he could not work with his own papers. Defendant knew he could not use his own papers because "if I am a suspect in that death … It's going to show up everywhere."

Rayas asked defendant, "*Why did you guys get involved in that*," and said his father cried when he found out. (Italics added.) Defendant asked Rayas what she told his father. Rayas replied, "That they were involving you in murder… He said everything is for his f[**]ken [*sic*] gangs and he was crying."

10.

Defendant said he had talked to Garza about joining him once he got situated. Rayas said she would leave once Chavez was released, and Chavez also intended to leave if he received probation. Rayas warned defendant to be on alert for any immigration authorities when he was on the train to Iowa.

**Defendant contacts Rizo**

At 6:29 p.m., a text message was sent from defendant's phone to Rizo's phone, which said: "U get home yet?"

At 6:33 p.m., a text message was sent from Rizo to defendant: "Give me an hour. I'm leaving Delano." At 6:38 p.m., a text message was sent from defendant to Rizo: "For sure though, I need to holla ASAP."

At 7:13 p.m., defendant called Rizo and asked for his location. Rizo said he was by Shafter, and he could be home in 15 minutes. Defendant told him to hurry because he was waiting outside.

## OCTOBER 27, 2012

**Defendant and Rayas**

At 11:35 a.m. on October 27, 2012, defendant called Rayas and said he was going to leave "tomorrow Sunday then."

At 6:07 p.m., Rayas called defendant and they talked about his travel arrangements. Rayas again passed along messages from Chavez to defendant. Chavez wanted defendant "to scram as soon as possible" and "to save your own head and not stay so they won't get you." Defendant was going to ask Garza's mother to pay for the train ticket with her credit card.

At 7:33 p.m., Rayas called defendant and said it was all arranged for him to live with their relatives in Iowa. Defendant had to take the train to Nebraska and then a bus to Des Moines. Rayas also reported that Lupe had a clean record, and he was willing to sell his papers to defendant. Defendant was happy because otherwise he was going to have to steal someone else's papers.

11.

Rayas asked defendant what he was doing with Chavez's cell phone. Defendant said he would leave it with Garza in case Chavez needed contact numbers. Defendant would not take his own cell phone with him because the parole officer would track him and discover he had left. They agreed that Garza would tell the police that she broke up with defendant, and she did not know where he was.

Around 10:00 p.m. on October 27, 2012, Deputy Murillo watched defendant purchase clothing and a large suitcase at Walmart in Bakersfield.

**ARREST OF RIZO**

On October 27, 2012, Deputy Hudson conducted a traffic stop on Rizo and arrested him.

**Search of Rizo's house**

After Rizo was arrested, Deputy Hudson and other officers searched Rizo's residence. In one bedroom, they found court documents and paperwork in Rizo's name, photographs of him, and paraphernalia from the New York Yankees.[4]

There was a couch in this same bedroom. The officers discovered a cavity had been cut out of the back portion of the couch. Inside that cavity, they found a steel assault-style rifle with a 30-round magazine, and a Smith & Wesson semiautomatic pistol lacking handgrips (serial No. A632153). The pistol was wrapped in a blue towel.

A pillow that had been on the couch contained a plastic bag with 10 individually wrapped bindles of marijuana. The pillow also contained two handguns: a chrome Taurus nine-millimeter handgun with a black grip (TNG 99899); and a dark black Taurus nine-millimeter semiautomatic handgun (TRE 08173), along with a loaded magazine and a nylon-style holster.

---

[4] The defense argued that Rizo was the likely gunman because of the "NY" cap found at the murder scene, and the Yankees paraphernalia in Rizo's bedroom.

12.

**Discovery of the murder weapon and defendant's DNA**

During subsequent tests, a criminalist determined the chrome Taurus (TNG 99899) found in Rizo's bedroom had fired the 8 nine-millimeter casings that were found at the scene of the homicide.

DNA samples were taken from defendant, Chavez, and Rizo, and their profiles compared with DNA tests conducted on the trigger slide and grips of that same handgun. The DNA profile from the gun had at least four contributors.

Defendant could not be excluded as a major contributor to the major portion of the DNA profile from the gun.

Rizo and Chavez were excluded as possible contributors to the major portion of the DNA profile, and the tests were inconclusive as to being possible contributors to the minor portion because there was not enough information in the DNA profiles to reach any conclusions.

## ARREST OF DEFENDANT

On October 28, 2012, several deputies from the Kern County Sheriff's Department arrested defendant at a motel in Bakersfield. Garza was with him. The deputies searched the motel room and seized two Samsung cell phones.

The deputies confirmed these were the same two cell phones that had been subject to the wiretap orders: 661-859-3637 and 661-281-7629.

**Defendant's postarrest interview**

At 4:30 a.m. on October 28, 2012, Detectives Conner and Brunsell conducted a videotaped interview with defendant. After being advised of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, defendant waived his rights and agreed to answer questions. Conner asked defendant if he knew why he was at the sheriff's department. Defendant said the only thing he had done wrong was to walk away from a men's home and fail to appear in court.

13.

Defendant admitted he was a "Southerner," but denied that he "ran" with anyone on the street. Upon further questioning, defendant said he was "from Colonia" and explained he grew up there. Detective Conner noted that defendant had a lot of gang tattoos. Defendant acknowledged he had grown up and hung out with persons in his neighborhood.

Defendant said he left the group home because he had a heroin addiction, and he wanted to "get the hell out of there and use." Defendant said he was now coming off heroin, was starting to "detox," and felt terrible. Defendant said that when he "went to prop 36, February 26th," he knew he was not going to make it and kept giving "dirty tests."

Defendant said he lived with his mother, and his brother was named George Chavez. He last spoke to his mother on the Thursday before he left the group home. Defendant said he had not talked to his brother for a week or so, and they had only discussed Chavez's case where he was beaten by the police.

Detective Conner asked defendant if he knew Trinidad Ortiz. Defendant said he had met him before in county jail. Conner asked defendant for Ortiz's location. Defendant said he did not know. Defendant said he heard Ortiz had been shot, and he went to a carwash to raise money for him. Defendant knew Ortiz was in the Colonia Bakers gang, and he did not know who shot him.

Defendant denied having a car and said he either walked or got rides from his girlfriend. His girlfriend drove a Mitsubishi Galant, which had been parked at the motel. Defendant said he spent most of his time getting high at his mother's house.

Detective Brunsell told defendant that they knew he was lying about when he talked to his mother and the topic of the conversation. Brunsell asked defendant to

14.

identify the phone number 910-3364.[5]  Defendant he did not know.  Brunsell told defendant he had talked to someone with that number.  Defendant was asked if he knew "Doofus."  Defendant said Doofus was a buddy, and his last name was "Rizo."  Defendant admitted he had recently talked to Rizo, but it was a brief conversation about whether Rizo was at home.

Detective Brunsell told defendant that at 8:04 p.m. on October 25, 2012, defendant called Rizo and asked where he was, and Rizo replied, "the southwest."  Brunsell further advised defendant that he asked Rizo if he still had the "burner"; Rizo said yes; and defendant told Rizo to get rid of it.  Defendant said he made these statements to Rizo so he could get money for the gun.

**Gang evidence**

The parties stipulated to the following facts relevant to the gang allegations:  The Colonia Bakers are a criminal street gang within the meaning of section 186.22. Defendant actively participated in Colonia Bakers from September 22 to October 27, 2012, and defendant knew that members of the gang engaged in or had engaged in a pattern of criminal gang activity.  On September 22, 2012, Chavez, Rizo and Ortiz were active participants of Colonia Bakers.

Deputy Ryan Greer testified as the prosecutor's expert on criminal street gangs. He testified the primary activities of the Colonia Bakers were assaults with deadly weapons, murders, and possession of controlled substances.  Greer had investigated crimes involving members of the Colonia Bakers and talked with various members of the gang.  Based on this background, Greer testified that members of the Colonia Bakers commit crimes together, and "[d]oing them in tandem will oftentimes help them accomplish these crimes in a better way.  They … feed off each other and pump each

_____

[5] Based on the wiretaps of the two target cell phones, the deputies determined this number was connected to Jose Rizo, and had monitored conversations between defendant and Rizo.

other up to commit the crime, depending on what the crime is, whether it's gun-related or drug sells or any type of crime such as that." Greer explained that the support of other gang members will bolster an individual member's confidence to commit the crime. In gang culture, members would be looked down upon if they did not complete a crime with another gang member.

Deputy Greer testified that firearms were important in gang culture because they were used for offense purposes against rivals or to support drug sales. They were also used for defense purposes. A gang member has an elevated status if he possessed a firearm.

Deputy Greer further testified that when law enforcement officers contact a gang member, the expectation within the culture is that the member will not speak to or cooperate with an investigation. If a gang member cooperates, he will be labeled a snitch and subject to death or other retaliatory action.

### DEFENSE EVIDENCE

### Krystal Garza

Krystal Garza was defendant's girlfriend, and she was with him when he was arrested at the motel. Garza testified she did not like Chavez because he was getting into trouble, and she did not get along with him. Chavez was very close to Jose "Doofus" Rizo.

Garza testified to an alibi for defendant on the day of the murder, September 22, 2012. Sometime between 2:30 p.m. and 3:30 p.m., defendant picked up Garza from her workplace because they were going to the fair that evening. After several delays, defendant said that Chavez and his girlfriend were going to join them. Garza testified that she and defendant spent about two hours getting ready to go to the fair.

Garza testified that as they were going to leave for the fair, Chavez started continuously calling defendant's cell phone. Defendant told Garza, "It's G. He's

16.

probably not going to go after all." Garza suggested they pick up Chavez's baby, and defendant agreed.

Garza testified they were driving to Chavez's house to pick up his son when defendant received another call from Chavez. Chavez said his son was not home, and to meet them somewhere else. Defendant and Garza followed Chavez's instructions and met him a few blocks away from Monterey Street. They picked up the baby, but he was not dressed appropriately. They drove to Chavez's mother's house, dressed the baby, and then headed to the fair.

Garza believed they arrived at the fairgrounds between 8:00 p.m. and 8:30 p.m. She paid for three tickets, and the tickets were introduced as exhibits. She also presented a photograph of defendant and herself taken that day. They stayed until 10:30 p.m. or 11:00 p.m.

Garza testified defendant did not receive any calls from Chavez while they were at the fair. After they returned home, defendant talked to Chavez. They went to Chavez's apartment later that night and stayed until 2:00 a.m.

Garza admitted that she talked with defendant about his plan to move to Iowa. Defendant wanted to move there because of problems with the Colonia Bakers gang. Garza felt they were not safe because members of the Colonia Bakers were upset about what happened to Ortiz, and the gang believed defendant and Chavez were involved.

On cross-examination, Garza denied that she went with defendant to Rizo's house. On further questioning, Garza admitted that defendant tried to contact Rizo on October 26, 2012, and she drove to Rizo's house that night. She claimed she stopped their car in front of Rizo's house and did not get out. Garza did not know why they were there.

The prosecutor played the recording of a telephone call between Garza and Rizo, from 8:01 p.m. on October 26, 2012. Garza admitted the call was made from the cell phone that she shared with defendant. During the call, Rizo asked Garza where Little Guy was, referring to defendant. Garza replied, "He's right here. [W]e still have to do

17.

something real quick.  We were there but he spent a long time um … he came to do an errand.  We'll be there right now."

Garza testified she stayed in a motel with defendant on October 26, 2012.  Garza had purchased a suitcase.

Garza admitted that when she was interviewed by an investigator in 2013, she said that they returned home from the fair around 10:30 p.m. and went to bed.  She never mentioned the story about the delays before they reached the fair, picking up Chavez's son, or going to Chavez's house later that night.

**Call between defendant and unknown male**

The defense introduced the recording of a call made by defendant to an unknown man (UM1) at 5:22 p.m. on October 25, 2012.  During the call, defendant identified himself as Little Guy.  He said that he had been in Avenal, and he was out on bail.  Defendant said he needed to talk to the man in person and not on the phone.  The man said that wasn't going to happen because he had been put "in a turning point" program.

Defendant said he needed to find out about " 'G' Dog."  The man said he heard about "the other case."  Defendant asked what he knew.  The man said:  "[S]omething he f[**]ked up with Scooby," but he could not get a straight story from anyone.  Defendant told him to check it out because "we need to clear this shit up while he is in there we are going to clear this shit up."  The man said, "[W]e are going to clear up no matter what … clearing it up has been in the works … you know what I am saying?"

Defendant replied:

"Yeah … because someone said that they didn't even blame 'G' fool they blamed me … at first they said it was Little [G]uy who did it … but whatever because they seen me pass by … *they seen my [car] pass[] by and Scooby was out there and I pulled up and [done' em] whatever ... this n[****]r said that they saw me do it ... right*?"  (Italics added.)

The man agreed.  Defendant continued that it was "corn dog actually," and he told "Huero" that he had been at the fair when it happened.  The man knew witnesses said

18.

defendant had been at the fair.  Defendant said he was there with his girlfriend, his little nephew, and "Cisco."

> "[Defendant]: So … I am just saying though like they try to say it was me and they to switch it up and say that it was 'G Money' or some shit … you know what I am saying?
>
> "UM1: Yeah.
>
> "[Defendant]: (Unintelligible) *Didn't that fool f[**]k up anyway and they wanted to get them*?
>
> "UM1: Who did?
>
> "[Defendant]: *Scooby.*
>
> "UM1: I don't really know about him like that.
>
> "[Defendant]: Do you remember 'G Money' telling me telling me something like … *Scooby f[**]ked up … that he was one of the reasons that something … something … I don't remember dog … I remember 'G Money' telling me something that is why he was supposedly trying to change his name or some shit.*
>
> "UM1; I don't really know dog … that is why I am trying to figure it out.
>
> "[Defendant]: I don't know fool… *but it's a bogus ass story or whatever you know… speculations or whatever people think this is bogus…*
>
> "UM1: Yeah.
>
> "[Defendant]: *We didn't have anything to do with that shit….*
>
> "UM1: So, what is up with 'G Money?'  What is he looking at right now?
>
> "[Defendant]: I guess they offered him like fifteen … like fifteen and two strikes."  (Italics added.)

## DISCUSSION

### I.     Aiding and Abetting Instructions

The prosecutor proceeded on two theories of first degree murder:  first degree willful, deliberate, and premeditated murder; and murder perpetuated by means of discharging a firearm from a motor vehicle at a person outside the vehicle with the specific intent to kill.  The prosecutor acknowledged it was not clear whether defendant was the gunman and/or the driver, but argued defendant was in the car when Ortiz was killed, and he was guilty of first degree murder based on wiretap conversations, his location based on the cell phone tower signals, and the DNA evidence on the murder weapon which excluded Chavez and Rizo but did not exclude defendant.  (§ 189)

On appeal, defendant challenges the aiding and abetting instructions for first degree murder.  He argues that these instructions, particularly CALCRIM No. 401, were "at best, ambiguous" on the specific intent required to find him guilty for aiding and abetting first degree premeditated murder.  Defendant asserts the instructions allowed the jury to convict him of first degree murder, as either the gunman or an aider and abettor, without proof that he personally premeditated and deliberated, or that he personally intended that a shooting from the car would kill the victim.  Defendant further argues the prosecutor exacerbated the purported instructional error in closing argument when he asserted that if defendant was "an aider and abettor of the firing of that gun," he was "equally liable" and "equally culpable" of first degree premeditated murder.

### A. Failure to Object

Defendant concedes that he never objected to CALCRIM No. 401 or argued any of the instructions failed to clarify the requisite intent for an aider and abettor to be guilty of first degree premeditated murder.  Defendant asserts this court may still review his arguments because the alleged instructional error affected his substantial rights.

"Generally, a party may not complain on appeal about a given instruction that was correct in law and responsive to the evidence unless the party made an appropriate

20.

objection. [Citation.] But we may review any instruction which affects the defendant's 'substantial rights' with or without a trial objection. [Citation.] 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim – at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

We thus turn to defendant's claim of instructional error. "We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole ... [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1088.)

## B. Aiding and Abetting First Degree Murder

"[A]n aider and abettor [must] act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citation.]" (*People v. Beeman* (1984) 35 Cal.3d 547, 560 (*Beeman*), italics in original.) "When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], the aider and abettor must share the specific intent of the perpetrator. By 'share' we mean neither that the aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime. [Citation.] Rather, an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the

21.

perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. [Citations.]" (*Ibid.*)

"[A]n appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*Beeman*, *supra*, 35 Cal.3d at p. 561.)

"[A]n aider and abettor's mental state must be at least that required of the direct perpetrator…. 'When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows *the full extent of the perpetrator's criminal purpose* and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118, italics added, fn. omitted.)

"Aiders and abettors may … be convicted of first degree premeditated murder based on direct aiding and abetting principles. [Citation.] Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. [Citation.] Because the mental state component – consisting of intent and knowledge – extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder. [Citations.] An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*People v. Chiu* (2014) 59 Cal.4th 155, 166–167.)

## C. **The Instructions**

### 1. *CALCRIM Nos. 400, 401*

The court gave the following instructions on defendant's culpability for murder. CALCRIM No. 400 stated:

> "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime, and I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

CALCRIM No. 401 defined aiding and abetting, and stated in relevant part:

> "To prove that the defendant is guilty of a crime on aiding and abetting that crime, the People must prove that, one, the perpetrator committed the crime. Two, the defendant knew that the perpetrator intended to commit the crime. Three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime. And, four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

> "*If someone aids and abets a crime, if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends and does, in fact, aid, facilitate, promote and encourage or instigate the perpetrator's commission of that crime. If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.*" (Italics added.)

### 2. *Malice and Intent*

The court gave CALCRIM No. 252, that first degree murder required a specific intent and/or mental state. The court instructed that first and second degree murder required malice aforethought, and defined express and implied malice. (CALCRIM No. 520)

### 3. *CALCRIM No. 521*

The jury also received CALCRIM No. 521, that defendant was being prosecuted for first degree murder under two theories:

23.

"One, the murder was willful, deliberate and premeditated. And, two, the murder was committed by shooting a firearm from a vehicle. Each theory of first degree murder has different requirements, and I will instruct you on both. You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved the defendant committed murder, but all of you … do not need to agree on the same theory."

> "The defendant [is] guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and knowing the consequences decided to kill. [¶] The defendant acted with premeditation if he decided to kill before completing the act that caused death...."

As to the second theory of first degree murder, the jury was instructed:

> "The defendant is guilty of first degree murder if the People have proved that the defendant murdered by shooting a firearm from a motor vehicle. The defendant committed this kind of murder if, one, he shot a firearm from a motor vehicle. Two, he intentionally shot at a person who was outside the vehicle. And, three, he intended to kill that person."

CALJIC No. 521 also stated that the People had the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. Finally, the court instructed the jury about the first degree murder instructions:

> "Now, if you find the defendant guilty of first degree murder, in effect, that would have to have been in conjunction with your finding on page 2 … or the 189 allegations that indicate that you would either [have] found that it was willful, premeditated, deliberate or that it was – discharge of a firearm from a motor vehicle, so you would have to have found essentially that to be true before you could actually return a verdict of first degree as in the instructions that I gave you."

## D. The Verdicts

The jury found defendant guilty of first degree murder and found true the section 189 special allegation, that the crime "was done by one of the following means: A)

24.

willful, deliberate, and premeditated killing; H) discharge of a firearm from a motor vehicle, intentionally at another person outside the vehicle, with the intent to inflict death; within the meaning of Penal Code section 189, as alleged in the first count of the Information."

As to the firearm enhancement, the jury found defendant was a principal in the offense, and, in the commission of the offense, at least one principal intentionally and personally discharged and personally used a firearm, and proximately caused death or great bodily injury, to a person other than an accomplice (§ 12022.53, subds. (d), (e)(1)). The gang enhancement was also found true.

### E. Analysis

Defendant argues that based on the jury's verdicts, particularly the finding on the firearm enhancement, he was convicted as an aider and abettor rather than the direct perpetrator of the murder. Defendant asserts that despite the extensive instructions on first degree murder and aiding and abetting, the specific intent definitions in CALCRIM No. 401 were not "lean and unequivocal" and the jury did not understand that it had to find defendant had the specific intent to aid and abet a premeditated murder.

Defendant's instructional arguments are meritless. "[A]n aider and abettor of a specific intent crime shares the perpetrator's specific intent when he or she knows of the perpetrator's criminal purpose and aids, promotes, encourages, or instigates the perpetrator with the intent of encouraging or facilitating the commission of the crime. [Citations.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1224.) *Beeman's* definition of aiding and abetting, and what it means to share the perpetrator's specific intent, has repeatedly been approved, and CALCRIM No. 401 adequately conveys those principles. (*People v. Houston*, *supra*, 54 Cal.4th at p. 1224; *People v. Prettyman* (1996) 14 Cal.4th 248, 259; *People v. Marshall* (1997) 15 Cal.4th 1, 40.) "CALCRIM No. 401 clearly provides that knowledge that the perpetrator intends to commit the crime is only one of the four elements for aiding and abetting liability. If the jury found mere knowledge

25.

alone, by the terms of CALCRIM No. 401, that would be insufficient to establish aiding and abetting liability. This point is even emphasized by the portion of the instruction that reads as follows: 'Someone *aids* and *abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.' (CALCRIM No. 401.)" (*People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1103–1104, italics in original.)

Defendant relies on *People v. Mendoza* (1998) 18 Cal.4th 1114 (*Mendoza*) and *People v. Lee* (2003) 31 Cal.4th 613 (*Lee*) in support of his claim that the aiding and abetting instructions were deficient. These cases do not support his argument. *Mendoza* focused on an unrelated issue: whether "section 22 permits defendants tried as aiders and abettors to present, and the jury to consider, evidence of intoxication on the question whether they had the requisite mental states of knowledge and intent." (*Mendoza*, *supra*, 18 Cal.4th at p. 1126.) *Mendoza* held "the intent requirement for aiding and abetting liability is a 'required specific intent' for which evidence of voluntary intoxication is admissible under section 22." (*Id.* at p. 1131.)

*Lee* also fails to support defendant's instructional arguments. *Lee* approved the formulation of the intent necessary to establish aiding and abetting, as stated in *Beeman* and incorporated in CALCRIM No. 401. (*Lee*, *supra*, 31 Cal.4th at p. 624.) "When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' (*People v. Beeman, supra,* 35 Cal.3d at p. 560.)" (*Ibid.*, fn. omitted.)

26.

Defendant further contends the prosecutor's closing argument purportedly confused the aiding and abetting instructions, based on the following italicized statements.

> "[T]here's two ways you can be guilty of murder. You can be the person who fired the gun. You can be the direct perpetrator of the murder. You can also be an aider and abettor. Both of those individuals are principals in a murder. So whether or not [defendant] fired that gun or whether or not you find him to be an aider and abettor of the firing of that gun, he is *equally liable*, and he is *equally culpable*, and some of that distinction does not come out within the jury instructions, but he is liable either way." (Italics added.)

The prosecutor's use of the phrase "equally guilty" is similar to instructional language in a previous version of CALCRIM No. 400, which some courts found was misleading. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164–1166; *People v. Nero* (2010) 181 Cal.App.4th 504, 518–519.) However, the jury in this case received the modified version of CALCRIM No. 400 which did not include the "equally guilty" phrase. Moreover, the prosecutor's use of those phrases in closing argument was not prejudicial. In cases where the jury received the "equally guilty" phrase in previous versions of CALCRIM No. 400, the instruction was still found to correctly state the requisite intent for the culpability of an aider and abettor for premeditated murder under certain circumstances:

> "CALCRIM No. 401 … stated that to prove guilt as an aider and abettor the prosecution was required to prove '1. The perpetrator committed the crime; 2. The defendant knew that the perpetrator intended to commit the crime; 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.' [¶] *It would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required.* [Citation.]" (*People v. Samaniego, supra*, 172 Cal.App.4th at p. 1166, italics added.)

27.

In this case, the jury received CALCRIM Nos. 401 and 521, regarding the necessity of finding defendant acted willfully, deliberately and with premeditation if he intended to kill. By finding defendant guilty of first degree murder, the jury necessarily found that he had acted willfully and with the intent to kill. Thus, although it was unknown whether he was an actual perpetrator or an aider and abettor, the prosecutor's use of those phrases was not prejudicial because the entirety of the court's instructions did not relieve the jury, under the court's other instructions, of finding defendant had the intent to kill at the time of the murder of Ortiz.

## II.     Instructions on the Gang Allegations

The court instructed the jury with CALCRIM No. 1401 for the elements of the gang enhancement:

> "To prove this allegation, the People must prove that, one, the defendant committed the crime for the benefit of *or in association with a criminal street gang*. And, two, the defendant intended to assist[,] further or promote criminal conduct by gang members." (Italics added.)

Defendant asserts the court had a sua sponte duty to define the phrase "in association with a criminal street gang," as used in CALCRIM No. 1401, because the phrase is a technical legal term. He argues the alleged instructional error was prejudicial because the prosecution relied on the "in association with" aspect of the gang enhancement, and argued the enhancement was true because defendant, a member of the Colonia Bakers, in association with Chavez and Rizo, also members of the Colonia Bakers, killed Ortiz, a member of the same gang.

" 'The trial court must instruct even without request on the general principles of law relevant to and governing the case ... [including] instructions on all of the elements of a charged offense.' [Citation.] Once the court has instructed on the general principles of law, a defendant must request additional instructions if he or she believes amplification or explanation is necessary. [Citations.] [¶] ' " '[T]he trial court's duty to see that the jurors are adequately informed on the law governing all the elements of the case ... is not

28.

always satisfied by a mere reading of wholly correct, requested instructions." '
[Citation.] ' "[T]he trial court has a *sua sponte* duty to give explanatory instructions even
in the absence of a request when the terms in an instruction 'have a "technical meaning
peculiar to the law." ' [Citations.] No such duty is imposed when the terms 'are
commonly understood by those familiar with the English language ....' " ' [Citations.]"
(*People v. Morehead* (2011) 191 Cal.App.4th 765, 772−773.)

In support of his instructional claim, defendant relies on *People v. Albillar* (2010)
51 Cal.4th 47 (*Albillar*), and argues the phrase "in association with" has a technical legal
meaning and the trial court had a sua sponte duty to define the phrase. In *Albillar,* three
fellow gang members were convicted of forcible rape and forcible sexual penetration of
the victim while acting in concert, and the gang enhancement was found true. The court
rejected the defendants' contention that there was insufficient evidence that the sexual
offenses were committed in association with the defendants' gang. (*Id.* at pp. 60−61.)

> "Defendants not only actively assisted each other in committing these
> crimes, but their common gang membership ensured that they could rely on
> each other's cooperation in committing these crimes and that they would
> benefit from committing them together. They relied on the gang's internal
> code to ensure that none of them would cooperate with the police, and on
> the gang's reputation to ensure that the victim did not contact the police.
> We therefore find substantial evidence that defendants came together as
> *gang members* to attack [the victim] and, thus, that they committed these
> crimes in association with the gang. [Citations.]" (*Id.* at pp. 61−62, italics
> in original.)

In a separate opinion in *Albillar*, Justice Werdegar dissented as to the majority
opinion's conclusion that the gang enhancement in that case was supported by substantial
evidence as to the "benefit" and "association" elements, particularly the majority
opinion's primary reliance on the expert's opinion to provide that substantial evidence.
(*Albillar, supra,* 51 Cal.4th at pp. 68, 70−73 (conc. & dis. opn. by Werdegar, J.).) Justice
Werdegar also took exception to the majority opinion's definition of "in association
with," and declared it rendered the language of section 186.22, subdivision (b) redundant.

(*Allibar*, *supra*, at pp. 73–74.)  Justice Werdegar concluded the jury's findings on the gang enhancements should be reversed because it "necessarily relied on the construction of the phrase provided by the prosecutor, a construction neither consistent with the statute nor endorsed by the majority."  (*Id.* at p. 74.)

*Albillar* did not provide a new definition for the phrase "in association with any criminal street gang," or hold that the phrase has a technical meaning requiring sua sponte instruction in future cases.  Instead, *Albillar* simply discussed the sufficiency of the evidence in establishing the elements of the criminal street gang enhancement.  Defendant's allegation of instructional error appears to be based on Justice Werdegar's concurring and dissenting opinion in *Albillar*.  Even if that separate opinion was controlling authority, however, Justice Werdegar did not advocate a specific definition for "in association with," but criticized the majority opinion for relying on the expert's opinion to provide substantial evidence in light of the prosecutor's purported erroneous definition of the phrase.  Moreover, Justice Werdegar cited to a common definition of "associate," namely the definition from the "Merriam–Webster's Eleventh Collegiate Dictionary (2004) at page 75" which defined " 'associate,' as '... 1: to come or be together as partners, friends, or companions 2: to combine or join with other parts.' "  (*Albillar*, *supra*, 51 Cal.4th at p. 70, fn. 2 (conc. & dis. opn. of Werdegar, J.).)

"When a word or phrase ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' [Citations.]  A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning.  [Citations.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 574, italics in original.)  *Albillar* did not create any sua sponte duty for the trial court to define "in association with" in CALCRIM No. 1401.  Here, absent defense counsel's request for further instruction on the phrase, the trial court's failure to define "in association with" did not amount to instructional error.

30.

## III. Evidence of the Gang Allegation

Defendant challenges the sufficiency of the evidence to support the gang enhancement pursuant to section 186.22, subdivision (b)(1); and derivative firearm allegation pursuant to section 12022.53, subdivisions (d) and (e). Defendant argues there was no evidence that defendant committed the murder of Ortiz "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

Defendant asserts the prosecutor improperly relied on the "in association with" clause to argue the gang enhancements were true, and misled the jury because that phrase "must mean something separate and distinct from 'in association with' gang members." Defendant contends there was no evidence that the Colonia Bakers gang itself was involved in the homicide, particularly since the court excluded evidence which might have established a motive for three gang members to murder a member of the same gang.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

## A. Substantial Evidence

"The enhancement set forth in section 186.22(b)(1) does not pose a risk of conviction for mere nominal or passive involvement with a gang. Indeed, it does not depend on membership in a gang at all. Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*Albillar*, *supra*, 51 Cal.4th at pp. 67–68.)

The gang enhancement contains two distinct "prongs." (*Albillar, supra,* 51 Cal.4th at pp. 51, 59.) The first prong requires proof the defendant committed a "gang-related crime," i.e., that it was for the benefit of, at the direction of, or in association with a gang. (*Id.* at pp. 59, 67.) A crime is committed in association with a gang if the "defendants relied on their common gang membership and the apparatus of the gang in committing" the charged felonies. (*Id.* at p. 60.) A gang member's commission of a crime in concert with other known gang members can be substantial evidence that the crime was committed in "association" with a gang. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) The jury may reasonably infer the association element of the first prong from the very fact the defendant committed the charged crime with another gang member, unless there is evidence that the gang members are "on a frolic and detour unrelated to the gang." (*Ibid.*; *Albillar, supra*, 51 Cal.4th at pp. 61–62, 67–68.) Where the evidence is sufficient to establish the crime was committed "in association" with a gang, the prosecution need not prove that it was committed for the benefit of or at the direction of a gang. (*People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198.)

The second "scienter" prong requires " 'the specific intent to promote, further, or assist in any criminal conduct by gang members,' " and "is unambiguous and applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Albillar*, *supra*, 51 Cal.4th at p. 66, italics in original.) "There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang;* the statute

32.

requires only the specific intent to promote, further, or assist criminal conduct by *gang members.* [Citations.]" (*Id*. at p. 67, italics in original.)

"[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar, supra,* 51 Cal.4th at p. 68.)

"There is rarely direct evidence that a crime was committed for the benefit of a gang. For this reason, 'we routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say.' [Citation.] 'Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime.' [Citations.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411–412.)

Thus, the joint commission of an offense is sufficient to infer that the gang members are acting together as gang members in the absence of evidence to the contrary. (*People v. Morales, supra,* 112 Cal.App.4th at p. 1198.) Proof of such association is sufficient to support the gang enhancement even in the absence of proof of tangible or reputational benefit to a gang. (*Ibid.*)

*Albillar* held that three gang members, who raped and sexually assaulted a 16-year-old girl, committed the crime "in association" with a gang because, as fellow gang members, they were able to rely upon each other to help facilitate the sexual assaults, they could expect their fellow gang members not to talk to the police, and they relied upon their membership in the gang to intimidate the victim. *(Albillar, supra,* 51 Cal.4th at pp. 61–62.)

In reaching this conclusion, *Albillar* acknowledged that "[n]ot every crime committed by gang members is related to a gang." (*Albillar*, *supra*, 51 Cal.4th at p. 60.)

33.

However, *Albillar* concluded there was substantial evidence to support the gang enhancement for the defendants' commission of multiple sexual assaults against the victim because the crimes were committed "in association with" a gang, and "[t]he record supported a finding that defendants relied on their common gang membership and the apparatus of the gang in committing the sex offenses against [the victim]." (*Id.* at p. 60.)

> "Because each defendant was a member of the Southside Chiques, he could and did rely on the others' cooperation in committing the offenses against [the victim].… Defendants knew, because of the nature of the gang, that no one would be a 'rat'…. Defendants also knew that fear of the gang would prevent [the victim] from reporting the incident to the police…. [¶] In short, defendants' conduct exceeded that which was necessary to establish that the offenses were committed in concert. Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police, and on the gang's reputation to ensure that the victim did not contact the police. We therefore find substantial evidence that defendants came together *as gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang. [Citations.]" (*Albillar*, *supra*, 51 Cal.4th at pp. 61−62.)

*Albillar* also noted the defendants were related to each other and lived together, and that " 'it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang.' [Citations.]" (*Albillar*, *supra*, 51 Cal.4th at p. 62.) "One may observe, however, 'that gang members frequently come from families in which relatives were also gang members.' [Citation.] Therefore, to presume, as defendants urge, that family ties necessarily predominate over gang affiliation when gang members who are related commit crimes together would substantially eviscerate the gang enhancement." (*Id.* at p. 62.) However, the record refuted the defendants' argument because of the extensive connections each defendant had with the gang. (*Id.* at pp. 62−63.)

**B. Analysis**

There is substantial evidence to support the "in association with" clause of the gang enhancement. The parties stipulated that the Colonia Bakers was a criminal street gang; defendant, Chavez, Rizo, and Ortiz (the victim) were active participants in the Colonia Bakers; and defendant knew that members of the gang engaged in or had engaged in a pattern of criminal gang activity.[6] The prosecution's gang expert testified that members of the Colonia Bakers commit crimes together, and doing so often helped the members accomplish the crimes in a "better way." "They … feed off each other and pump each other up to commit the crime." The expert further testified the support of other gang members will bolster an individual member's confidence to commit the crime.

As noted above, " '[c]ommission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime.' [Citations.]" (*People v. Miranda*, *supra*, 192 Cal.App.4th at p. 412.) The wiretap evidence demonstrated that defendant committed the murder in association with his fellow gang members, Chavez and Rizo. They repeatedly contacted each other in the minutes before and after the 911 call which reported the murder. Once defendant and Chavez learned that they were suspected in the murder, there were additional cell phone calls as Chavez instructed defendant, either directly or through their mother, to keep quiet and get out of Bakersfield. Defendant acknowledged the seriousness of his predicament to his mother as a result of using his gun, and gave emphatic instructions to Rizo to get rid of the "burner," thus demonstrating that Rizo obtained possession of the murder

---

[6] The parties' stipulations eliminated any dispute as to whether the Colonia Bakers was a criminal street gang as defined by the California Street Terrorism Enforcement and Prevention Act (the STEP Act). (§ 186.20 et. seq.; cf. *People v. Prunty* (2015) 62 Cal.4th 59, 67−68.)

weapon shortly after the homicide. The murder weapon was found in Rizo's house, and the DNA tests excluded Chavez and Rizo but did not exclude defendant.

Defendant asserts there is no evidence that the murder of a fellow gang member was committed on behalf of the gang, and makes much of the court's pretrial evidentiary rulings which excluded certain evidence. As defendant explains, the prosecution planned to introduce evidence about statements made by Rizo and Vincent "Turkey" Pugeda, another member of the Colonia Bakers. According to the prosecution's pretrial offer of proof, Pugeda said Ortiz told him that he broke into Chavez's house, and Chavez told Rizo that he killed Ortiz because of a drug-related burglary and to "save face within the gang." Pugeda subsequently asserted his Fifth Amendment privilege and refused to testify, and the court excluded hearsay statements made by Pugeda and Rizo on the topic. Defendant thus concludes that in the absence of Pugeda's statements, there was no evidence that the murder of a fellow gang member was gang-related.

The issue of whether defendant committed the murder of Ortiz "in association with" the Colonia Bakers was a disputed factual question for the jury to determine. However, where the evidence is sufficient to establish the crime was committed "in association" with a gang, the prosecution need not prove that it was committed for the benefit of or at the direction of a gang. (*People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198.) As in *Abillar*, the record supported a finding that defendant relied on his common gang membership with Chavez and Rizo, and the apparatus of the gang, in committing the murder in this case. (*Abillar*, *supra*, 59 Cal.4th at p. 60.)

In addition, there was evidence which raised a possible motive for the three gang members to kill a member of their own gang. Defendant introduced the tape-recorded cell phone conversation between defendant and an "unknown male," which occurred on October 25, 2012. Defendant argued the conversation showed that he disavowed any involvement in the murder of Ortiz. The entirety of that conversation raised additional inferences. The "unknown male" clearly knew defendant, Chavez, and Ortiz, and that

36.

their monikers were, respectively, "Little Man," "G Money," and "Scooby." The man also knew that defendant and Chavez were suspected in Ortiz's murder, and that defendant claimed he was at the fair at the time of the murder. As the conversation continued, defendant talked about "Scooby" and said: "*Didn't that fool f[\*\*]k up anyway and they wanted to get them*?" The man said he did not know. Defendant asked the man if he remembered that Chavez said "something like … *Scooby f[\*\*]ked up … that he was one of the reasons that something … something … I don't remember dog … I remember 'G Money' telling me something that is why he was supposedly trying to change his name or some shit.*" (Italics added.) The man again said he did not know. At that point, defendant finally said, "We didn't have anything to do with that shit." Nevertheless, defendant brought up the possible motive of a conflict between Chavez and Ortiz that was so serious that "they wanted to get him," and Ortiz was going to "change his name."

We conclude there is substantial evidence of the joint commission of an offense "in association with" other known gang members, which supplies an inference of specific intent to promote or assist other gang members. (*Albillar, supra*, 51 Cal.4th at p. 68; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

## IV. <u>Motion to Compel Disclosure</u>

As explained above, the investigation into Ortiz's murder was significantly aided when the court issued search warrants for wiretaps on cell phones associated with defendant and Chavez. The search warrant motions were supported by sealed confidential affidavits filed pursuant to *People v. Hobbs* (1994) 7 Cal.4th 948 (*Hobbs*).

Prior to trial, defendant moved for disclosure of the sealed *Hobbs* attachments and disclosure of the confidential information. Defendant also moved to traverse the wiretap warrants based on the disclosure of the information in the sealed affidavits. The court conducted an in camera hearing and denied defendant's motions.

Defendant requests this court to review the confidential sealed information and transcript of the in camera hearing, and determine whether the superior court properly

denied his motion for disclosure of the confidential information, and his motion to traverse the search warrants for the wiretaps.

### A. *Hobbs*

All or part of a search warrant affidavit may be sealed if necessary to protect the identity of an informant who has supplied probable cause for the issuance of the warrant. (*Hobbs, supra,* 7 Cal.4th at p. 971.) In such cases, where the defendant moves to traverse or quash the warrant, the trial court is required to conduct an in camera hearing. (*Id.* at p. 972.) The court must determine at the in camera hearing whether there are sufficient grounds for maintaining the confidentiality of the informant's identity, and whether the extent of the sealing is necessary to protect the informant's identity. (*Ibid.*) Absent a waiver from the prosecutor, the defendant and his attorney may not attend the in camera hearing. (*Id.* at p. 973.)

If the trial court determines all or part of the affidavit was properly sealed, it must next determine if there is any merit to the defendant's motion to traverse. (*Hobbs, supra,* 7 Cal.4th at p. 974.) The court must determine whether the affidavit included a false statement made knowingly and intentionally or with reckless disregard of the truth, and whether the false statement is necessary to a finding of probable cause. (*Ibid.*) The determination must be based on the public and sealed portions of the affidavit and any testimony offered at the in camera hearing. (*Ibid.*) If there is no merit to the motion to traverse, the court should so inform the defendant and deny the motion. (*Ibid.*)

If the court determines there is a reasonable probability the defendant will prevail on the motion, the prosecutor must be given the option of disclosing the sealed materials, or suffering the entry of an adverse order on the motion to traverse. (*Hobbs*, *supra*, 7 Cal.4th at pp. 974–975.)

If the defendant moves to quash the warrant, the procedure is similar. The trial court must determine whether, under the totality of the circumstances, the affidavit and related materials furnished probable cause for the issuance of the warrant. (*Hobbs, supra,*

7 Cal.4th at p. 975.) If the court determines there is probable cause, the court should so inform the defendant and deny the motion. (*Ibid*.) If the court determines there is a reasonable probability the defendant will prevail on his motion to quash the warrant, the prosecutor must either disclose the sealed materials to the defense, or suffer the entry of an adverse order on the motion to quash. (*Ibid*.; see also *People v. Martinez* (2005) 132 Cal.App.4th 233, 240–242.)

## B. Analysis

Based on our independent review of the record, including the sealed and confidential portions of the search warrant applications and affidavits, and the transcript of the court's in camera hearing, we find the there was probable cause to issue the warrants in this case and defendant's motions were properly denied. Consequently, there is no *Hobbs* error to correct on appeal, and the *Hobbs* affidavits and all other documents which were already sealed and confidential shall remain so.

## DISPOSITION

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
FRANSON, J.